# REDACTED EXHIBIT 8

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

SIMO HOLDING, INC.,                    )
                                       )
        Plaintiff,                     )
                                       )
        vs.                            ) Civil Action No.
                                       ) 18-cv-5427-(JSR)
HONG KONG UCLOUDLINK NETWORK           )
TECHNOLOGY LIMITED AND                 )
UCLOUDLINK (AMERICA), LTD.,            )
                                       )
        Defendants.                    )
_____)

DEPOSITION OF JOHN L. HANSEN

Wednesday, February 13, 2019

San Francisco, California

Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 46095

1   worldwide sales were, but there was some information
2   in the record that provided a summary of historical
3   sales and projection that provided a breakdown that
4   showed a substantial majority of Skyroam sales
5   and -- were occurring in the United States.  And my
6   understanding is a lot of uCloudlink sales occur
7   overseas.  So you would have to look at the
8   distribution channels, the customers, the partners,
9   to understand whether or not they were even
10  positioned to compete.
11          So, for example, if a customer purchased a
12  uCloudlink device in Hong Kong, depending upon where
13  they purchased it, how they purchased it, Skyroam
14  may or may not have competed for that sale.  There
15  has been no analysis of that by Mr. Martinez.
16       Q.   Well, do they compete for sales in the
17  United States?
18       A.   It would depend.
19       Q.   Depend on what?
20       A.   It would depend on the customer and
21  whether or not Skyroam actually competed to make a
22  sale to that customer.  So they both have sales
23  available through e-commerce channels.  They have
24  different rental partners.  So you could have a
25  consumer that's in a location that only has a

```
 1    in the United States or people that were -- or, let
 2    me strike that.  That's a confusing question.
 3            So is there any indication in the data of
 4    what devices are using that data?
 5        A.   Not that I'm aware of.
 6        Q.   How does -- if you know, how does
 7    uCloudlink determine how much data is consumed in
 8    the United States?
 9        A.   Technically, I'm not aware of the
10    mechanisms they used.
11        Q.   Okay.  Someone living in the United States
12    presumably would not need to buy U.S. day pass
13    because they could just use their cell phone that
14    they have here in the United States, right?
15            MR. BUSBY:  Objection.
16            THE WITNESS:  That's one possibility.
17    BY MR. DAVIS:
18        Q.   Did you look at any data that was used
19    outside of the United States?
20        A.   The information that I had on total data
21    use came from informational summary of uCloudlink.
22    So it wasn't granular in nature, but it did provide
23    an overall average daily gigabytes of data use for
24    worldwide for uCloudlink.
25        Q.   Okay.  Did you try to determine how much
```

1  data was used by U.S. citizens who had purchased an
2  uCloudlink device?
3      A.  I did not.
4      Q.  So to give you an example, if someone had
5  purchased a uCloudlink hotspot here in the United
6  States, but then traveled to Spain, and used data in
7  Spain, does your damages analysis capture data usage
8  in Spain for that U.S. consumer who bought a Wi-Fi
9  hotspot here?
10     **A.  The data usage that I have utilized is**
11 **data usage within the United States.  So I haven't**
12 **used -- I didn't -- that information is not**
13 **available, as I understand it, that would allow you**
14 **to track data usage to a particular device, and the**
15 **location of where that data was used, in particular.**
16     Q.  Do you think it would be appropriate to
17 include, in the royalty base, data that was used
18 abroad by a United States person who bought a
19 uCloudlink device in the United States?
20         MR. BUSBY:  Objection.
21         THE WITNESS:  I don't believe so.
22 BY MR. DAVIS:
23     Q.  Why not?
24     **A.  My understanding is that use of a device**
25 **overseas would not be active infringement.  Selling**

1  **data services, in and of themselves, is not an act**
2  **of infringement.  So the usage that's occurring**
3  **overseas would not be subject to United States**
4  **patent law.**
5       Q.   But your smallest salable practicing --
6  patent-practicing unit is not a service, it's just
7  components of a device, right?
8       A.   That's correct.
9       Q.   And so how can you say that's the smallest
10 salable patent-practicing unit and yet not encompass
11 for the data for which you say damages -- or the
12 royalty base should be made up of?
13      A.   Because the device has to be used with
14 **data.  So what I've done is, I've taken data that's**
15 **actually used in the United States as a surrogate or**
16 **basis to understand the relative value of offering**
17 **their combined product and service for use in the**
18 **United States.  So they're going to be products, as**
19 **I understand, that could have been sold overseas.**
20 **That would not be an infringing sale, that could be**
21 **brought to the United States and used.  And I've**
22 **used -- I've included that in the royalty base any**
23 data that that product used.  My understanding is
24 **that selling the data service in the U.S. doesn't**
25 **infringe.  Selling the product overseas doesn't**

1   customers in the United States even though it may be
2   for somewhere outside the United States, for
3   example, Spain?
4        A.   Could you repeat that, please?
5        Q.   Sure.
6             Would Skyroam take into account, during
7   the hypothetical negotiation, data purchased by
8   customers in the United States, even though that
9   data may be used somewhere outside the United
10  States?
11       **A.   I think it's a consideration.  The**
12  **relative importance of the United States market**
13  **versus other markets.  The relative data usage,**
14  **device sales, those are all pieces of information.**
15       Q.   Earlier you used, I believe, the
16  phrase "closed system."
17            Do you recall that?
18       **A.   Yes.**
19       Q.   And so -- and I -- correct me if I get
20  this wrong, but I believe you described meaning that
21  once you buy a Skyroam device you have to use the
22  Skyroam network.  And once you buy a uCloudlink
23  device, you have to use an uCloudlink network, is
24  that sort of a fair example?
25       **A.   Well, you don't have to use it.  But the**

1   is -- is it why do I have a U.S.-based cell phone?
2   I'm not following your question.
3        Q.   No.  I'm just saying that the reason why
4   people buy U.S. data for uCloudlink and Skyroam is
5   because they're traveling from abroad into the
6   United States and they want to use their data at a
7   lower roaming rate than their roaming rate, right?
8        A.   My understanding is that's the primary use
9   case, not just for the United States, but worldwide.
10       Q.   Okay.  And those people that are traveling
11  internationally into United States to use U.S. data
12  are not subscribed to U.S. MNOs such as T-Mobile,
13  Verizon or AT&T, are they?
14       A.   I wouldn't expect that they would be.
15  They may be.
16       Q.   Well, in order to take advantage of the
17  U.S. MNO day passes, you have to be subscribed to
18  their monthly service, correct?
19       A.   That would be my understanding, yes.
20       Q.   So you can't just buy a day pass from AT&T
21  and Verizon, and T-Mobile, without also having a --
22  some sort of monthly or annual service contract,
23  correct?
24       A.   If I followed your question, you need to
25  be a subscriber to that network?

1        My question was not related to
2   Mr. Martinez's opinions at all.  It was just if you
3   know whether or not uCloudlink's direct-to-business
4   consumers were buying any associated services or
5   products such as PaaS or SIM banks.
6        A.   I would have to look back at the source
7   documents.  As I mentioned previously in this
8   deposition, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12       Q.   Right.
13            Why would a business just buy just the
14  units, as opposed to buying the service or the
15  ability to manage that service?  Do you have any
16  understanding about that?
17            MR. BUSBY:  Objection.
18            THE WITNESS:  It would depend on the
19  individual business, the size and intended use of
20  the products.  I -- there are -- there's some
21  discussion in some of the documents about ▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮.
24  BY MR. DAVIS:
25       Q.   As you sit here today, you don't know

239

```
 1                    CERTIFICATE OF REPORTER
 2
 3           I, Hanna Kim, a Certified Shorthand
 4   Reporter, do hereby certify:
 5           That prior to being examined, the witness
 6   in the foregoing proceedings was by me duly sworn to
 7   testify to the truth, the whole truth, and nothing
 8   but the truth;
 9           That said proceedings were taken before me
10   at the time and place therein set forth and were
11   taken down by me in shorthand and thereafter
12   transcribed into typewriting under my direction and
13   supervision;
14           I further certify that I am neither
15   counsel for, nor related to, any party to said
16   proceedings, not in anywise interested in the
17   outcome thereof.
18           In witness whereof, I have hereunto
19   subscribed my name.
20
21   Dated:  ____ day of _____, 2019
22
23                        _____
                          Hanna Kim
24                        CLR, CSR No. 13083
25
```