# EXHIBIT 1

SIMO Holdings Inc.

v.

Hong Kong uCloudlink Network Technology Limited, and
uCloudlink America, Ltd.

Case No. 18-cv-5427 JSR

Expert Rebuttal Report of John L. Hansen

TM Financial Forensics, LLC
February 1, 2019

John L. Hansen

**I.     INTRODUCTION** ..................................................................................................... **3**

   A.   TM Financial Forensics, LLC / Qualifications ................................................. 3

   B.   Retention and Assignment ................................................................................. 4

   C.   Information Considered ...................................................................................... 4

**II.    SUMMARY OF OPINIONS** ................................................................................ **5**

   A.   Summary SIMO's Alleged Damages.................................................................. 5

   B.   Summary of Opinions ........................................................................................ 6

**III.   BACKGROUND** ..................................................................................................... **7**

   A.   SIMO.................................................................................................................. 7

   B.   uCloudlink......................................................................................................... 9

   C.   Patent-In-Suit .................................................................................................. 12

   D.   Accused Products and Data Services ............................................................... 12

**IV.   OPINIONS** .......................................................................................................... **13**

   A.   Determination of a Reasonable Royalty .......................................................... 13

      *Factor 1: The Royalties Received By The Patentee For The Licensing Of The Patent In Suit, Proving Or Tending To Prove An Established Royalty* ...................................................................................... 14

      *Factor 2: The Rates Paid By The Licensee For The Use Of Other Patents Comparable To The Patent In Suit* ............................................................................................................................. 15

      *Factor 3: The Nature And Scope Of The License, As Exclusive Or Non-Exclusive; Or As Restricted Or Non-Restricted In Terms Of Territory Or With Respect To Whom The Manufactured Products May Be Sold* ........................................................................................................................... 15

      *Factor 4: The Licensor's Established Policy And Marketing Program To Maintain His Patent Monopoly By Not Licensing Others To Use The Invention Or By Granting Licenses Under Special Conditions Designed To Preserve That Monopoly* ........................................................................... 16

      *Factor 5: The Commercial Relationship Between The Licensor And Licensee, Such As, Whether They Are Competitors In The Same Territory In The Same Line Of Business; Or Whether They Are Inventor And Promoter* ............................................................................................................. 16

      *Factor 6: The Effect Of Selling The Patented Specialty In Promoting Sales Of Other Products Of The Licensee; The Existing Value Of The Invention To The Licensor As A Generator Of Sales Of His Non-Patented Items; And The Extent Of Such Derivative Or Convoyed Sales* ................................. 18

      *Factor 7: The Duration Of The Patent And The Term Of The License* .............................................. 18

      *Factor 8: The Established Profitability Of The Product Made Under The Patent; Its Commercial Success; And Its Current Popularity* ........................................................................................... 19

*Factor 9: The Utility And Advantages Of The Patent Property Over The Old Modes Or Devices, If Any, That Had Been Used For Working Out Similar Results* ..................................................... 24

*Factor 10: The Nature Of The Patented Invention; The Character Of The Commercial Embodiment Of It As Owned And Produced By The Licensor; And The Benefits To Those Who Have Used The Invention* ........................................................................................................................... 24

*Factor 11: The Extent To Which The Infringer Has Made Use Of The Invention; And Any Evidence Probative Of The Value Of That Use* ............................................................................ 25

*Factor 12: The Portion Of The Profit Or Of The Selling Price That May Be Customary In The Particular Business Or In Comparable Businesses To Allow For The Use Of The Invention Or Analogous Inventions* ............................................................................................................... 26

*Factor 13: The Portion Of The Realizable Profit That Should Be Credited To The Invention As Distinguished From Non-Patented Elements, The Manufacturing Process, Business Risks, Or Significant Features Or Improvements Added By The Infringer* ........................................... 27

*Factor 14: The Opinion Testimony Of Qualified Experts* ................................................. 31

*Factor 15: The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license* ....................................................................................... 31

**V.    REBUTTAL TO THE MARTINEZ REPORT** ................................................... **35**

A.    Mr. Martinez's Use of Skyroam's Wholesale Gross Profit on Daypasses as the Basis for His Reasonable Royalty is Theoretically Flawed and Overstated ............................................. 35

B.    Mr. Martinez Ignored uCloudlink's Profit Margins and Ability to Pay His Claimed Royalty Rate ........................................................................................................................................ 37

C.    Mr. Martinez Effectively Claims Skyroam Lost Profits Through His Reasonable Royalty Rate Without Demonstrating Any Lost Sales ......................................................................... 38

D.    Mr. Martinez's "Zero-Sum Game" Position is Erroneous and Unsupported ................... 39

E.    Mr. Martinez Fails to Apportion The Value Of The Accused Products and Data Services for Elements Unrelated to the '689 Patent ............................................................................... 41

F.    Mr. Martinez's Use of Skyroam Proposals in *Georgia-Pacific* Factor 1 is Unreliable and Speculative ........................................................................................................................ 43

**VI.    PRE-JUDGMENT INTEREST** ....................................................................... **44**

## I.    <u>INTRODUCTION</u>

### A.    TM Financial Forensics, LLC / Qualifications

1.    TM Financial Forensics, LLC ("TMF") is a business, economic, financial and damages consulting company that provides services to business entities, individuals and counsel. I am a Vice President and founding member of TMF in the San Francisco office. I am also a Certified Public Accountant licensed in the State of California, Certified in Financial Forensics, a Certified Licensing Professional and a Chartered Global Management Accountant. Before founding TMF on January 5, 2010, I was a Director in the San Francisco office of Navigant Consulting, Inc. Before joining Navigant Consulting, Inc. in 2004, I was a Vice President in the San Francisco office of Tucker Alan Inc. ("Tucker Alan") and one of the leaders of Tucker Alan's national intellectual property practice. Prior to joining Tucker Alan in August 1994, I was employed by Peterson Consulting, where I provided consulting to clients on a variety of regulatory and commercial matters. I graduated with honors from Santa Clara University in 1989 with a Bachelor of Science in Commerce degree in finance and minor in economics, and currently serve on the Advisory Board for the Leavey School of Business at Santa Clara University.

2.    I am experienced in the financial, economic and accounting matters relating to the scope of our work, analysis and study on this matter. I have consulted on numerous intellectual property infringement, valuation and licensing-related matters. I have also assisted clients in the valuation and licensing of intellectual property rights. I have prepared and analyzed hundreds of claims for lost profits, reasonable royalties, increased costs and other financial and economic impacts. I have also presented and lectured on intellectual property valuation and damages, including to Santa Clara University School of Law, Stanford University, University of California Hastings College of the Law, the Licensing Executives Society and the Rocky Mountain Intellectual Property & Technology Institute.

3.    My curriculum vitae, including publications during the last ten years, is included as **Attachment 1** to this Rebuttal Report. A listing of cases in which I have testified as an expert witness at trial, arbitration and/or deposition is included as **Attachment 2** to this Rebuttal Report. My hourly billing rate on this matter is $575.

4.      TMF's compensation is not dependent on the outcome of this matter.

### B.      Retention and Assignment

5.      TMF was retained by Hong Kong uCloudlink Network Technology Limited ("Hong Kong uCloudlink") and uCloudlink America, Ltd. ("uCloudlink America") (collectively, "uCloudlink") and its counsel to address damages issues related to the patent infringement allegations set forth by SIMO Holdings Inc. ("SIMO") in the above-captioned case.[1]  I understand that SIMO alleges that uCloudlink infringed U.S. Patent No. 9,736,689 ("the '689 patent" or the "patent-in-suit").  Although I understand that uCloudlink denies and disputes both validity and infringement of the patent-in-suit, for purposes of this Rebuttal Report, I have assumed that the '689 patent will be found to be not invalid and infringed by uCloudlink.  TMF has also been asked to review SIMO's damages analysis and opinion set forth in the Expert Report of Christopher A. Martinez dated January 14, 2019 (the "Martinez Report").[2]

### C.      Information Considered

6.      **Attachment 3** to this Rebuttal Report contains a listing of various documents, data and other information considered in forming my opinions in this matter.  I have also had discussions with Dr. Martin Feuerstein, a technical expert retained on behalf of uCloudlink.  Selected pages of the documents and information listed on **Attachment 3** may be used as exhibits to summarize or support my opinions.  Additionally, I may prepare graphical or illustrative exhibits to use at trial based on the documents and information relied upon and my analysis of those documents and information.

7.      The opinions in this Rebuttal Report are based on currently available information.  If representatives of uCloudlink, SIMO and/or experts retained on behalf of SIMO present additional information, then my opinions and conclusions may be supplemented, amended or revised.

---

[1] SIMO First Amended Complaint for Patent Infringement, August 20, 2018 ("Amended Complaint"). Stipulation Regarding Dismissal of Count 1 of SIMO Holdings' Inc.'s Amended Complaint (U.S. Patent No. 8,116,735) with Prejudice, January 17, 2019.
[2] Expert Report of Christopher A. Martinez, January 14, 2019 ("Martinez Report").

between August 20, 2018 and September 30, 2018.[13]  Applying a royalty rate of $3.00 per Daypass results in a reasonable royalty of approximately $0.793 million.[14]

**B.      Summary of Opinions**

11.    Assuming validity and infringement, I understand that SIMO is entitled to be awarded damages adequate to compensate for the infringement.  I further understand that Skyroam, the party that manufactures and sells products and services that compete with uCloudlink's products and services, is not a plaintiff in this action.  Therefore, SIMO is not entitled to recover lost profits because SIMO does not manufacture and sell products and services in the United States.  Furthermore, there were acceptable non-infringing substitutes available, SIMO has not demonstrated that it was positioned to make the alleged infringing sales, and there is no evidence of demand for the patented invention from customers.

12.    In these circumstances, SIMO's damages may be determined by a reasonable royalty based on a hypothetical negotiation between SIMO and uCloudlink for a license to the '689 patent.  Based on my analysis of financial, economic, licensing and technical facts and circumstances in this case as set forth in my evaluation of the *Georgia-Pacific* factors, I have determined a reasonable royalty for the '689 patent is $0.15 per 500 MB Daypass.

13.    I have relied on uCloudlink's United States monthly data usage to calculate the royalty base during the period of alleged infringement.  According to this data, ▓▓▓▓▓▓, or approximately ▓▓▓▓ MB Daypasses, of uCloudlink data was consumed in the United States from August 20, 2018 through September 30, 2018 (see **Attachment 8**).[15]  Applying the $0.15 per 500 MB Daypass to the equivalent ▓▓▓▓ uCloudlink Daypasses consumed in the United States from August 20, 2018 through September 30, 2018 results in total royalties of $39,642.[16]

---

[13] Martinez Report: ¶15, Schedule 4B.
[14] Martinez Report: ¶15, Schedule 4B.
[15] Alternatively, I have calculated 721,011,098 MB, or approximately 1,442,022 500 MB Daypasses, of uCloudlink data was consumed in the United States from August 15, 2017 through September 30, 2018 (see **Attachment 8**).
[16] Alternatively, applying $0.15 per 500 MB Daypass to uCloudlink data consumed in the United States from August 15, 2017 to September 30, 2018 results in total royalties of $216,303.

name Roaming Man.[41]  In September 2015, uCloudlink released the first 4G mobile Wi-Fi device, the GlocalMe G2.[42]  uCloudlink has office locations in China, Hong Kong, Europe, and the United States and currently has more than 1,200 employees.[43]  In 2017, uCloudlink America generated ███████ in revenue, while Hong Kong uCloudlink generated ███████ in revenue.[44]

23.  uCloudlink provides products and services through three brands: GlocalMe, Roaming Man, and uCloudlink (collectively, "uCloudlink hotspot").[45]  Through the purchase or rental of a uCloudlink hotspot, consumers can access secure Wi-Fi in more than 140 countries.[46]  uCloudlink hotspots connect to the best local network available through vSIM technology called CloudSIM, so consumers can obtain mobile data without changing the SIM cards in their devices.[47]  On the back end, the "uCloudlink CloudSIM service platform maintains local SIM cards of 140+ countries and regions…to provide a high speed and stable network experience for the user."[48]  Purchasers of hotspots can access data after purchasing a Daypass, a data package, or a data subscription.[49]

24.  uCloudlink hotspots and associated data services available to be used in the United States can be purchased through the GlocalMe website, Amazon.com, and through uCloudlink direct-to-business customers.[50]  Data services purchased through Amazon.com and direct-to-business customers are bundled with the hotspots and cannot be purchased standalone through these channels.[51]  The majority of uCloudlink's bundled device and data service sales in the United States are generated ██████████████

---

[41] https://www.ucloudlink.com/html/introduction.
[42] https://www.ucloudlink.com/html/introduction.
[43] https://www.ucloudlink.com/html/introduction; Deposition of Hua Wei, November 6, 2018: Exhibit 25 [UCLOUDLINK0013622-656 at 627-628].
[44] **Attachment 6; Attachment 7**.
[45] https://www.ucloudlink.com/html/introduction.
[46] https://www.ucloudlink.com/html/introduction; https://www.glocalme.com/about/glocalme?lang=en-US&giso=US; https://www.roamingman.com/about. Note that Roaming Man indicates coverage in more than 135 companies.
[47] Deposition of Jianlin Liao, November 5, 2018: Exhibit 20 [UCLOUDLINK0013740-759 at 749].
[48] Deposition of Jianlin Liao, November 5, 2018: Exhibit 20 [UCLOUDLINK0013740-759 at 750].
[49] uCloudlink refers to these data units as a "DayPass" or "Day Pass." I have referred to these data units as Daypass throughout this Rebuttal Report.
[50] https://www.glocalme.com/glocalme/where_to_buy?lang=en-US&giso=US; https://www.amazon.com/stores/node/10065706011; https://www.roamingman.com/order/index/device_order.
[51] https://www.amazon.com/stores/node/10065706011; Deposition of Hua Wei, November 6, 2018: p. 33.

■.[62]  uCloudlink offers a 24-hour Daypass of 300 MB of data at full speed, and unlimited data thereafter that is throttled to 256kbps, for $3.50.[63]

## C.    Patent-In-Suit

28.    The '689 patent is titled, "System and Method for Mobile Telephone Roaming."[64]  The '689 patent was issued on August 15, 2017, and is assigned to SIMO Holdings Inc.[65]  The '689 patent is a continuation of Application No. 12/039,646 filed on February 28, 2008, and issued as U.S. Patent No. 8,116,735, which was originally asserted against uCloudlink in this matter.[66]

## D.    Accused Products and Data Services

29.    I understand SIMO alleges that certain models of uCloudlink's Wi-Fi hotspot devices and mobile phones that access data through uCloudlink's data service network in the United States infringe the '689 patent (the "Accused Products and Data Services").[67]  The Accused Products are summarized below in **TABLE 2**.

### TABLE 2: Summary of Accused Products

| Model Name | Device Type | Date First Sold in U.S. [68] |
|---|---|---|
| GlocalMe G2 | Hotspot | January 2016 |
| GlocalMe U2 | Hotspot | January 2017 |
| GlocalMe G3 | Hotspot | June 2017 |
| GlocalMe S1 | Mobile Phone | January 2018 |

30.    Although uCloudlink first sold a product accused to infringe the '689 patent in January 2016,[69] the '689 patent did not issue until August 15, 2017.[70]  Therefore, damages would begin no earlier than the issue date of the '689 patent.  However, I understand that uCloudlink asserts that SIMO failed to comply with the marking requirements of 35

---

[62] https://www.glocalme.com/data_package?lang=en-US&giso=US.
[63] https://www.glocalme.com/data_package/settlement?goodsCode=GlocalMeUS_US_DP300MB5&lang=en-US&giso=US.
[64] U.S. Patent No. 9,736,689.
[65] U.S. Patent No. 9,736,689.
[66] Amended Complaint, ¶15; Stipulation Regarding Dismissal of Count 1 of SIMO Holdings' Inc.'s Amended Complaint (U.S. Patent No. 8,116,735) with Prejudice, January 17, 2019. Mr. Martinez's claimed damages only relate to the '689 patent.
[67] Amended Complaint, ¶15.
[68] Deposition of Hua Wei, November 6, 2018: p. 86, 109-112; Deposition of Jianlin Liao, November 5, 2018: Exhibit 20 [UCLOUDLINK0013740-759 at 744].
[69] Deposition of Hua Wei, November 6, 2018: p. 86.
[70] U.S. Patent No. 9,736,689.

exclusive license would command a lower royalty than an exclusive license. The geographic limitation to the United States would not impact a running royalty rate for a United States patent, as the royalty rate would only be applied to sales that are covered by the patent.

> **Factor 4**: The Licensor's Established Policy And Marketing Program To Maintain His Patent Monopoly By Not Licensing Others To Use The Invention Or By Granting Licenses Under Special Conditions Designed To Preserve That Monopoly

40. SIMO has not licensed the '689 patent to third parties or asserted the patent-in-suit against any other party.[81]   Additionally, Eric Plam, President of Skyroam, testified that he was not aware of any Skyroam policies regarding patent license agreements.[82]   While there does not appear to be an established licensing policy, SIMO has asserted the '689 patent against uCloudlink, indicating a desire to protect its patent monopoly from competitors. However, the lack of licensees and assertions that other parties' solutions available in the market utilize the '689 patent indicates that competitive products available in the market from third parties reflect non-infringing alternatives.   Overall, factor 4 has a neutral influence on the royalty in the hypothetical negotiation between SIMO and uCloudlink.[83]

> **Factor 5**: The Commercial Relationship Between The Licensor And Licensee, Such As, Whether They Are Competitors In The Same Territory In The Same Line Of Business; Or Whether They Are Inventor And Promoter

41. uCloudlink, Skyroam and multiple other companies compete for sales of products and services to provide international data roaming.   The presence of third-party competitors, as well as non-infringing alternatives available to uCloudlink (addressed in *Georgia-Pacific* factors 9 and 10 below), limit the impact of potential competition between SIMO and uCloudlink in the hypothetical negotiation.

42. SIMO considers uCloudlink to be a direct competitor, but also identifies numerous other competitors.   For example, in a May 2017 internal Skyroam Enterprise Analysis, Skyroam identified ███████████████████████████████████ as competitors in

---

[81] Deposition of Jing Liu, November 7, 2018: p. 87-88, 94, 119-120; Deposition of Eric Plam, November 7, 2018: p. 187, 202-203.
[82] Deposition of Eric Plam, November 7, 2018: p. 174.
[83] Consideration of the potential impact of competition between the parties is addressed in *Georgia-Pacific* factor 5.

addition to GlocalMe.[84]  When asked to identify Skyroam's primary competitors in the United States, Eric Plam, Skyroam President, testified that ""[85]  Mr. Plam further testified that "competition comes in a lot of forms."[86]  In addition to global hotspot competition, there are substitute global data service options, including purchasing local SIMs, roaming SIMs, and data roaming plans through mobile carriers.[87]  Currently, Skyroam's biggest competition in the United States market is ███████████████.[88] Mr. Plam testified that in the United States hotspot market, Skyroam has ██████ of the retail partner market segment, ████ of the ecommerce hotspot market, and ████████ of the direct-to-business market segment.[89]

43.   uCloudlink considers Skyroam a direct competitor, but also identifies numerous other competitors.  For example, Hua Wei, uCloudlink Deputy Director of Branding, identified ██████████████████████████████████████████████ as competitors, in addition to Skyroam.[90]  uCloudlink also compared its product and service offerings to major United States network operators AT&T, T-Mobile, Verizon and Sprint.[91]

44.   Numerous industry sources discuss the existence of competitively priced daypasses from mobile network operators as of the date of first infringement.  For example, in October 2013 T-Mobile was the first to offer unlimited international data and text services in over 100 countries for no extra charge to its subscribers.[92]  In August 2018, T-Mobile began offering a $5 daypass for 512 MB of LTE.[93]  In November 2015, Verizon began offering

---

[84] Skyroam Enterprise Analysis, May 16, 2017: SIMO_0167686-707 at 690-691; Deposition of Eric Plam, November 7, 2018: Exhibit 5 [SIMO_0167685].
[85] Deposition of Eric Plam, November 7, 2018: p. 10, 82.
[86] Deposition of Eric Plam, November 7, 2018: p. 84.
[87] Deposition of Eric Plam, November 7, 2018: p. 84-85; SIMO_0167685.
[88] Deposition of Eric Plam, November 7, 2018: p. 123-124.
[89] Deposition of Eric Plam, November 7, 2018: p. 85-87, 93-94.
[90] Deposition of Hua Wei, November 6, 2018: p. 17, 89-90, 93-94.
[91] Deposition of Hua Wei, November 6, 2018: p. 88-89, Exhibit 29 [SIMO_0172788-804 at 793].
[92] "T-Mobile Announces Unlimited Global Data Roaming at No Extra Charge," The Verge: https://www.theverge.com/2013/10/9/4821692/t-mobile-announces-unlimited-global-data-roaming-at-no-extra-charge.
[93] "T-Mobile Now Offers $5 Day Passes to Bump International Plan to 512MB of LTE," The Verge: https://www.theverge.com/2018/7/17/17581322/t-mobile-international-data-plan-5-daily-pass-512mb-4g-lte

54.	However, I understand the data services revenue presented in the United States income statement does not include standalone data package purchases and represents an allocated dollar value for uCloudlink data services bundled with each GlocalMe device sold.[103] Additionally, this data does not include the volume of data services included in the bundled sales.[104]  I further understand that uCloudlink does not track where the Accused Products ultimately used data services.[105]  Therefore, the United States income statements for uCloudlink are less instructive in the hypothetical negotiation for a license to the '689 patent.

55.	As uCloudlink does not track where the Accused Products used data, and devices and data services used in the United States may not have been purchased in the United States or captured in the uCloudlink United States income statement, uCloudlink would consider the profit margins of Hong Kong uCloudlink in the hypothetical negotiation.[106]  From January 2015 through September 2018, Hong Kong uCloudlink reported sales of devices and data services of approximately ████  ████  worldwide, resulting in gross profits of approximately ██████████ for an average gross margin of ████ (see **Attachment 7**).  Hong Kong uCloudlink's gross margin on data services alone for this period was approximately ██████ (see **Attachment 7**).[107]  In 2017, uCloudlink reported device and data services sales of approximately █████ million worldwide, resulting in gross profits of approximately ██████████ for a █████ gross margin (see **Attachment 7**).  Hong Kong uCloudlink's gross margin on data services alone for 2017 was approximately ██████ (see **Attachment 7**).

56.	At a minimum, uCloudlink's selling and marketing expenses are necessary to generate sales of the Accused Products and Data Services.  Hong Kong uCloudlink selling and marketing expenses for January 2015 through September 2018 total approximately ████ of net revenue, while selling and marketing expenses for 2017 total approximately ████ of net revenue (see **Attachment 7**).  To determine uCloudlink's profit margin on data

---

[103] Deposition of Jianlin Liao, November 5, 2018: p. 43-44.

[104] UCLOUDLINK0344621.

[105] Deposition of Jianlin Liao, November 5, 2018: p. 31, 45 and 53.

[106] Deposition of Jianlin Liao, November 5, 2018: p. 31, 44-45 and 53.  The Hong Kong uCloudlink income statement includes the United States financial information.

[107] Hong Kong uCloudlink's gross margin on device sales alone was approximately ████ for the period January 2015 through September 2018 (see **Attachment 7**).

services, I deducted the selling and marketing expense percentages from the gross profit margin for January 2015 through September 2018 and 2017 resulting in an incremental profit margin ranging from approximately ███████████ [108]

57.   The current retail price of a uCloudlink 300 MB Daypass for use in the United States is $3.50, or approximately $0.0117/MB.[109]  This revenue per MB calculation assumes that uCloudlink customers only use 300 MB per Daypass and never use throttled data beyond 300 MB.   As indicated on **Attachment 9.1**, Skyroam customers during the damages period (August through November 2018) used ████ MB per Daypass, using ████████ MB of throttled data on average.  Assuming uCloudlink customers used ███ MB of data for each Daypass would lower the revenue per MB used to ██████.  Applying an incremental profit margin of ████████████ results in uCloudlink incremental profit of approximately ██████████████ per MB, based on ███ MB use per Daypass and ████████████████ based on ███ MB use per Daypass (see **Attachment 4**). This equates to ███████████ per ████ MB Daypass (based on ████ MB use) and ████████████ per ████ MB Daypass (based on ████ MB use) for data used in the United States (see **Attachment 4**).

58.   As addressed in *Georgia-Pacific* factor 13 and the critiques of Mr. Martinez below, these incremental profits are prior to apportioning the value related to the patented invention from the profits attributable to components, features, and other contributions to profits unrelated to the patent-in-suit.  I understand that "[t]he patentee…must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" or show that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature."[110]  The Federal Circuit has indicated that it is not enough to show the patented element is "viewed as valuable, important, or even essential" to the use of the accused products.[111]  I further understand that the Federal Circuit has

---

[108] Calculated as: ████████████████

[109] https://www.glocalme.com/data_package/settlement?goodsCode=GlocalMeUS_US_DP300MB5&lang=en-US&giso=US.  Calculated as: $3.50 / 300 MB = $0.0117/MB.  Daypass provides 300 MB data at full speed, and unlimited data thereafter that is throttled to 256kbps.

[110] *Uniloc USA v. Microsoft*, United States Court of Appeals for the Federal Circuit, Case No. 03-cv-0440, Decided January 4, 2011, p. 48.

[111] *LaserDynamics, Inc. v. Quanta Computer, Inc., et al.* (Federal Circuit, August 30, 2012), p. 25.

percentages are prior to apportioning the value related to the other patents, features and functionality provided by these components that are unrelated to the '689 patent. Based on discussions with Dr. Feuerstein, I understand that the functionality related to the alleged infringement accounts for less than half of the functionality provided by the baseband processor and memory SSPPU components.[118]

61.  Overall, *Georgia-Pacific* factor 8 provides an incremental profit ranging from █████ ███ per ██ MB Daypass. However, these incremental profits are prior to apportioning the value related to the SSPPU components of approximately ███, resulting in profits ranging from ██████████ per ██ MB Daypass for the SSPPU. Accounting for other functions performed by the SSPPU components unrelated to the '689 patent indicates that the profits potentially attributable to the '689 patent range from approximately ██████ ███ per ██ MB Daypass (see **Attachment 4**).



> **<u>Factor 9</u>: The Utility And Advantages Of The Patent Property Over The Old Modes Or Devices, If Any, That Had Been Used For Working Out Similar Results**
>
> *and*
>
> **<u>Factor 10</u>: The Nature Of The Patented Invention; The Character Of The Commercial Embodiment Of It As Owned And Produced By The Licensor; And The Benefits To Those Who Have Used The Invention**

62.  I understand uCloudlink had an acceptable, non-infringing alternative design available throughout the damages period and could have implemented the alternative if faced with an uneconomic royalty request by SIMO.

63.  Based on discussions with Dr. Martin Feuerstein, I understand that uCloudlink could have configured its products so that when used in the United States they would have used an eSIM to connect to the local carrier instead of the ██████████████████. This would have required uCloudlink to write, test and validate the software code before including it in firmware on its devices. I understand that this non-infringing alternative solution

---

[118] Based on discussion with Dr. Martin Feuerstein, I understand that the █████████████████████████████ ████████████████████████, which implicate thousands of standard essential patents. I further understand that █████████████████████ ████████████████████████████, as well as the other non-infringing features of the Accused Products.

- I am not aware of a royalty rate that may be customary in this business.

83. Overall, these factors are not instructive in the determination of a reasonable royalty for a license to the '689 patent.

84. *Georgia-Pacific* factors 5, 6, 8 and 13 generally address the profitability of products that practice that patent-in-suit and the competitive relationship of the parties to the hypothetical negotiation. Primary considerations under these factors include:

- uCloudlink, Skyroam and multiple other parties compete for sales of Wi-Fi hotspots and international roaming data services. Skyroam has ▮▮▮▮▮ of the retail partner market segment, ▮▮ of the ecommerce hotspot market, and ▮▮▮▮▮ of the direct-to-business market segment.

- While SIMO would consider the potential competition from uCloudlink, the presence of third party non-infringing alternatives would limit the expected financial benefit to SIMO from not granting a license to uCloudlink.

- uCloudlink's products have been commercially successful and earned limited profits. However, uCloudlink's profits are attributable to numerous factors beyond the '689 patent.

- The wholesale average price of a Skyroam 500 MB Daypass is ▮▮▮ with a gross margin of ▮▮▮, resulting in ▮▮▮ of gross profit. Deducting the costs necessary to generate Skyroam's sales of Patented Product and Data Services results in a profit margin ranging from ▮▮▮▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮▮▮▮▮▮, or profits of approximately ▮▮▮▮▮ to ▮▮▮ per 500 MB Daypass.

- The current retail price of a uCloudlink 300 MB Daypass for use in the United States is $3.50, or approximately $0.0117 per MB assuming that uCloudlink customers only use 300 MB per Daypass. Assuming uCloudlink customers used 450 MB of data for each Daypass would lower the revenue per MB used to $0.0078.

- Applying a profit margin of ▮▮▮▮▮ per MB, or ▮▮▮▮▮ results in uCloudlink profit of approximately ▮▮▮▮▮▮▮▮▮ per MB, or ▮▮▮▮▮ per 500 MB Daypass for data used in the United States assuming 300 MB are used per uCloudlink 300 MB Daypass. Assuming 450 MB are used per 300 MB uCloudlink Daypass results in uCloudlink profit of approximately ▮▮▮▮▮▮▮ per MB, or ▮▮▮▮▮ per 500 MB Daypass for data used in the United States.

- The SSPPU for the Accused Products accounts for approximately ▮▮▮▮▮ of the total cost of the product, or approximately ▮▮▮. This results in profits ranging from ▮▮▮▮▮ per 500 MB Daypass for the SSPPU.

- I understand the functionality related to the alleged infringement accounts for less than half of the functionality provided by the baseband processor and memory SSPPU components.

- uCloudlink's Accused Products practice the uCloudlink Asserted Patents, and I understand that the SSPPU components for '689 patent are also related to the uCloudlink Asserted Patents.

- Accounting for the other features unrelated to the '689 patent indicates that the profits potentially attributable to the '689 patent range from approximately ███ ████ per 500 MB Daypass.

- Non-patented elements contribute to uCloudlink's sales and profits for the Accused Products and Data Services.

- uCloudlink undertook significant investments and business risks which contributed to its sales and profits.

- uCloudlink's sales are driven by its established sales and distribution network, partnerships, customer relationships, the GlocalMe brand, uCloudlink's 24/7 customer service, and its own intellectual property, as examples.

85.   SIMO would consider the potential competition for sales and increased price competition when licensing the patent-in-suit to uCloudlink.  However, any upward pressure is limited by the presence of available non-infringing alternatives.  Additionally, uCloudlink's other contributions to the Accused Products and Data Services and limited overall company operating profit limit the value of the patented invention in the hypothetical negotiation. Overall, consideration of these factors indicates a royalty rate ranging from approximately ██████████ per 500 MB Daypass would account for the profits attributable to the '689 patent.

86.   *Georgia-Pacific* factors 9, 10 and 11 generally address the nature of the invention and its importance to the licensee and the Accused Products and Data Services.   Primary considerations under these factors include:

- uCloudlink would have been able to offer a commercially acceptable product for sale without utilizing the patent-in-suit throughout the period of alleged infringement.

- uCloudlink's acceptable non-infringing alternative design would have taken no more than █████ to design and implement and would limit the royalty rate that uCloudlink would be willing to pay and SIMO would reasonably expect to receive for a license to the '689 patent.

- Approximately █████ GB (█████████ MB), or approximately ███████████ MB Daypasses, of uCloudlink data was consumed in the United States from August 15, 2017 to September 30, 2018.

- Approximately ███ GB (████████ MB), or approximately ███████ MB Daypasses, of uCloudlink data was consumed in the United States from August 20, 2018 through September 30, 2018.

- United States data consumption only reflects approximately ████████ of uCloudlink's overall worldwide daily data consumption.

87.  These factors indicate that while uCloudlink has enjoyed sales for the Accused Products and Data Services, the sales and profits are not attributable to the patent-in-suit.  The minimal cost to implement an acceptable non-infringing alternative would limit the royalty rate the uCloudlink would be willing to pay in the hypothetical negotiation.  These factors place downward pressure on the royalty rate in the hypothetical negotiation.

88.  *Georgia-Pacific* factors 3, 4 and 7 address the nature and scope of the hypothetical license.  While the non-exclusive nature of the hypothetical license would put downward pressure on a reasonable royalty rate, SIMO's desire to protect its patent monopoly from competitors would tend to place would upward pressure on the reasonable royalty rate.  Overall, these factors are neutral in the determination of a reasonable royalty rate in the hypothetical negotiation.

89.  As reflected on uCloudlink's income statement (see **Attachment 7**), profit is generated by the Accused Products through the provision of uCloudlink data services.  As discussed above in *Georgia-Pacific* factor 8, uCloudlink produced a summary of the gigabytes of data used monthly in the United States from August 2016 through September 2018.[142]  Since uCloudlink does not track where its devices are used, a usage-based royalty rate tied to data used in the United States would be reasonable in this circumstance.

90.  Apportioning the profits attributable to the '689 patent indicates a royalty rate ranging from ████████ for each equivalent uCloudlink 500 MB Daypass used in the United States.  Assuming customers used 450 MB of data for each uCloudlink 300 MB Daypass (consistent with Skyroam customers using throttled data in excess of the Daypass MBs) indicates a royalty rate of ████████ for each equivalent 500 MB Daypass.  Applying the same approach to apportion Skyroam's Daypass profitability (i.e., ████ of profit is attributable to the SSPPU components, and ██████████ of the SSPPU profit is attributable to the functionality accused to infringe the '689 patent) indicates a royalty

---

[142] UCLOUDLINK0384587.

rate of ███ per 500 MB Daypass.  The acceptable non-infringing alternative design, significant competition from third parties, substantial uCloudlink contributions to sales, and minimal data consumed in the United States relative to the rest of the world put downward pressure on the royalty rate in the hypothetical negotiation, indicating a royalty rate at or near the low end of the range would be appropriate.  After consideration of the *Georgia-Pacific* factors detailed above, it is my opinion that a reasonable royalty rate of ███ per 500 MB Daypass should be applied to uCloudlink's data usage in the United States.

91.   I have relied on uCloudlink's United States monthly data usage to calculate the royalty base during the period of alleged infringement.  According to this data, ████ MB, or approximately ████ MB Daypasses of uCloudlink data, was consumed in the United States from August 20, 2018 to September 30, 2018 (see **Attachment 8**).[143]  Applying the ███ per 500 MB Daypass to the equivalent ███ uCloudlink Daypasses consumed in the United States from August 20, 2018 to September 30, 2018 results in total royalties of ███.[144]

## V.     REBUTTAL TO THE MARTINEZ REPORT

92.   As addressed in my determination of a reasonable royalty above, Mr. Martinez's analysis and conclusions are flawed and unsupported.  In addition, specific criticisms of Mr. Martinez's analysis and opinions are presented in the following section.

### A.     Mr. Martinez's Use of Skyroam's Wholesale Gross Profit on Daypasses as the Basis for His Reasonable Royalty is Theoretically Flawed and Overstated

93.   Mr. Martinez opines that he "would not expect Skyroam to accept a reasonable royalty of less than the wholesale profits per Daypass that the company would expect to forego by licensing vSIM technology to uCloudlink."[145]  As discussed below, Mr. Martinez's royalty rate erroneously attributes Skyroam's entire gross profit on wholesale data services to the '689 patent.  But Mr. Martinez's "wholesale incremental profit" figure

---

[143] Alternatively, I have calculated ████ MB, or approximately ████ MB Daypasses, of uCloudlink data was consumed in the United States from August 15, 2017 through September 30, 2018 (see **Attachment 8**).
[144] Alternatively, applying ███ per 500 MB Daypass to uCloudlink data consumed in the United States from August 15, 2017 to September 30, 2018 results in total royalties of ███.
[145] Martinez Report: ¶95.

35