# EXHIBIT 2

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK


SIMO HOLDING, INC.,                )
                                   )
        Plaintiff,                 )
                                   )
        vs.                        ) Civil Action No.
                                   ) 18-cv-5427-(JSR)
HONG KONG UCLOUDLINK NETWORK       )
TECHNOLOGY LIMITED AND             )
UCLOUDLINK (AMERICA), LTD.,        )
                                   )
        Defendants.                )
_____   )


DEPOSITION OF JOHN L. HANSEN



Wednesday, February 13, 2019

San Francisco, California




Reported By:

Hanna Kim, CLR, CSR No. 13083

Job No. 46095

Hansen, John L.                                    February 13, 2019

39

1    in profits between the entities.  If I understand

2    what you're saying, your testimony and at least your

3    report -- let me strike that.  Let me ask you a new

4    question.  I apologize.

5              Is it fair to say that in 2017 alone,

6    Ucloudlink America made ███ -- approximately

7    ███████ in profit?  And I got that from paragraph

8    53 of your report.

9         A.   The -- I'm sorry.  Did you ask about 2017?

10        Q.   That's correct.

11        A.   If your question was the ███████ --

12        Q.   Yeah, let me -- let me just --

13        A.   That's gross profit.  They had an

14   operating loss of ███████.  But, again, I would

15   caution that I don't believe this income statement

16   is complete, so I wouldn't rely on these profit

17   numbers.

18        Q.   All right.  I'll ask that question in just

19   a second.

20              In 2017 alone, you believe that Ucloudlink

21   America had ███ -- approximately ███████in gross

22   profit, correct?

23        A.   That's correct.

24        Q.   Okay.  Now, you --

25        A.   That's what they've reported.

Hansen, John L.                                    February 13, 2019

40

1        Q.   And so you've said that -- that you don't

2    believe the income statement is complete.  Do I have

3    that right?

4        **A.   That's correct.**

5        Q.   And what do you believe is incomplete

6    about the income statement?

7        **A.   My understanding is that standalone**

8    **purchases of data services after the initial bundled**

9    **device and data sale would not be captured or picked**

10   **up in the U.S. entity.  So there would be additional**

11   **revenue and, I would expect, profit associated with**

12   **that sale.  And that's just simply not captured**

13   **based on the way they maintain their books and**

14   **records.**

15       Q.   Were you ever able to get to that data of

16   standalone data sales?

17       **A.   I have data sales for the company as a**

18   **whole, but not broken out for the United States.**

19       Q.   To your understanding, does uCloudlink

20   sell data packages for the United States only?

21       **A.   My understanding is that they do.**

22       Q.   And it's your understanding that -- that

23   the defendants sell global data packages, meaning

24   that that data could be used anywhere in which there

25   is a -- in which uCloudlink has global service?

Hansen, John L.                                February 13, 2019

42

1       A.   What do you mean?

2       Q.   Did you review Mr. Martinez's report?

3       A.   Yes, I did.

4       Q.   Okay.  And -- and Mr. Martinez offered an

5  opinion that the business model was -- between

6  Skyroam and uCloudlink was virtually identical; is

7  that right?

8       A.   I do recall him using that phraseology.

9       Q.   Do you agree with that opinion from

10  Mr. Martinez?

11       A.   I think virtually identical is a stretch.

12  They're similar and they sell a similar product.

13  They have similar distribution channels available to

14  both companies.  They both engage in sales and

15  rentals, e-commerce, to a differing level direct

16  business sales.  So they do sell similar products

17  and similar services through similar channels.

18       Q.   And so, if I break that down a little bit,

19  you agree that they both sell directly to consumers,

20  correct?

21       A.   Yes.

22       Q.   And you agree that -- that both sell

23  directly to businesses; is that correct?

24       A.   They do.

25       Q.   Okay.  And you agree that both companies

Hansen, John L.                                    February 13, 2019

43

1   rent their Wi-Fi hotspots?

2       A.   **Both directly and through various types of**

3   **rental partners.**

4       Q.   And you agree that they both sell data in

5   varying increments of amount of data or time

6   periods, correct?

7       A.   **They both provide data services.  They**

8   **have a variety of different packages or options**

9   **available to consumers that are -- are different,**

10  **and have different levels of speed and throttle**

11  **rates associated with them.**

12      Q.   Do they both sell in roughly the same

13  geographic areas?

14      A.   **I have not done a geographic comparison.**

15      Q.   Do they compete for the same customers?

16      A.   **That would depend entirely upon the**

17  **customer and the location.**

18      Q.   Are you aware of any group of or class of

19  or types of customers in which one of the parties

20  sells to and the other party does not sell to?

21      A.   **Well, I think if you're talking about**

22  **general categories of selling to businesses and**

23  **consumers, they would both potentially sell to**

24  **businesses and consumers.  There were documents that**

25  **indicated -- I couldn't recall before what the**

Hansen, John L.                         February 13, 2019

44

1   worldwide sales were, but there was some information

2   in the record that provided a summary of historical

3   sales and projection that provided a breakdown that

4   showed a substantial majority of Skyroam sales

5   and -- were occurring in the United States.  And my

6   understanding is a lot of uCloudlink sales occur

7   overseas.  So you would have to look at the

8   distribution channels, the customers, the partners,

9   to understand whether or not they were even

10  positioned to compete.

11          So, for example, if a customer purchased a

12  uCloudlink device in Hong Kong, depending upon where

13  they purchased it, how they purchased it, Skyroam

14  may or may not have competed for that sale.  There

15  has been no analysis of that by Mr. Martinez.

16      Q.   Well, do they compete for sales in the

17  United States?

18      A.   It would depend.

19      Q.   Depend on what?

20      A.   It would depend on the customer and

21  whether or not Skyroam actually competed to make a

22  sale to that customer.  So they both have sales

23  available through e-commerce channels.  They have

24  different rental partners.  So you could have a

25  consumer that's in a location that only has a

Hansen, John L.                                    February 13, 2019

45

1    **Skyroam rental available or only has a uCloudlink**

2    **rental available.  In the United States, I think it**

3    **was around ▆ percent of uCloudlink's reported sales**

4    **were in the direct-to-business channel, and I see no**

5    **evidence that Skyroam actually competed to make the**

6    **sales to the -- reflects ▆ percent of uCloudlink**

7    **sales.  So it would depend.**

8        Q.   How many employees does Ucloudlink America

9    have in the United States?

10       A.   **I don't recall a specific number.**

11       Q.   I think Mr. Martinez indicated that there

12   were ▆ employees in the United States for

13   Ucloudlink America.  Does that sound about right?

14       A.   **I don't recall that specifically.  I do**

15   **recall at one point ▆ employees for Skyroam in**

16   **China.**

17       Q.   Okay.  Let's look at Exhibit 2,

18   Mr. Martinez's report --

19       A.   **Okay.**

20       Q.   -- paragraph 33, and the last sentence of

21   paragraph 33.  In that paragraph, while you're

22   reading it, Mr. Martinez states, "The U.S.

23   subsidiary for U.S. uCloudlink has ▆▆▆▆

24   employees in New York that is responsible for the

25   company's sales and rental businesses in the United

Henderson Legal Services, Inc.

Hansen, John L.                                    February 13, 2019

46

1   States."

2            Do you see that?

3       A.   I do.

4       Q.   Do you know if there are ████████████

5   ████ employees in the -- in Ucloudlink America that

6   are based in America?

7       A.   I might have misunder- -- heard your

8   question.

9       Q.   I'll repeat it.  Sorry about that.

10      A.   Thank you.

11      Q.   Do you know if there are ████████████

12  ████ employees for Ucloudlink America that are based

13  in America?

14      A.   I don't have a specific head count figure.

15      Q.   Okay.  Regardless, uCloudlink has

16  employees in the United States that are responsible

17  for sales, correct?

18      A.   Yes.

19      Q.   And -- and Skyroam has employees in the

20  United States that are responsible for sales,

21  correct?

22      A.   That's correct.  The testimony was, I

23  believe, ████ salespeople.

24      Q.   And -- and both companies engage in

25  marketing in the United States, correct?

Henderson Legal Services, Inc.

202-220-4158              www.hendersonlegalservices.com

Hansen, John L.                                    February 13, 2019

47

1       **A.    They both do conduct marketing in the**
2  **United States, that's correct.**
3       Q.    They both have websites that are
4  accessible in the United States advertising their
5  products and services, correct?
6       **A.    That's a fair characterization, yes.**
7       Q.    And it's possible for consumers to
8  purchase products from both companies off of those
9  websites, correct?
10      **A.    That's my understanding.**
11      Q.    All right.
12            MR. DAVIS:  Mr. Hansen, we've been going
13  about an hour.  Is it okay with you that we take a
14  little bit of a break?
15            THE WITNESS:  Yeah, that's fine.
16            (Short recess taken, 10:08 a.m. -
17            10:18 a.m.)
18  BY MR. DAVIS:
19      Q.    Welcome back, Mr. Hansen.
20            You gave an opinion as to the reasonable
21  royalty award that -- if there is a finding of
22  liability, that should issue in this case, correct?
23      **A.    That's correct.**
24      Q.    And is the construct of which you base
25  that opinion on, the hypothetical negotiation

Hansen, John L.                                    February 13, 2019

67

1  to create a higher rate, an upward influence on the

2  royalty rate?  Excuse me.

3      **A.   All -- all other things equal, that's**

4  **generally the direction, that's correct.**

5      Q.   Do you understand that one of

6  Mr. Martinez's opinions is that the parties would

7  have agreed to a usage-based royalty rate?

8      **A.   Yes.**

9      Q.   And you agree that there would be a

10 usage-based royalty rate in this case, correct?

11     **A.   Based on the facts and circumstances, I do**

12 **believe that a usage-based royalty rate is an**

13 **appropriate way to compensate SIMO, or SIMO, for the**

14 **infringement of the '689 Patent.**

15     Q.   And the ultimate conclusion that you have

16 is that the usage-based royalty rate would be ██████

17 per ████ megabytes of United States data, correct?

18     **A.   Per equivalent ████-megabyte day pass, if**

19 **you will.**

20     Q.   And so you agree then that an -- that an

21 appropriate basis to compensate SIMO in this case

22 would be to have a usage-based royalty?

23     **A.   Based on the structure of the companies,**

24 **how they conduct their business, in my view, that**

25 **appropriately compensates the patent holder for use**

Hansen, John L.                    February 13, 2019

68

1    of the invention in the United States.

2         Q.   You -- following up with one of the

3    answers you just gave, you quantified data usage in

4    terms of day passes, correct?

5         A.   I do both on a per-megabyte basis.  And

6    then for ease of comparison, I also convert that to

7    a ███-megabyte equivalent.  But really I create a

8    range based on different usage assumptions.  So it's

9    not a straight per-day-pass rate, if you will.  But

10   I -- I've created a range based on usage and how

11   that usage would translate into revenue for

12   uCloudlink.

13        Q.   Mr. Martinez also use data usage in terms

14   of per megabyte or data pass, correct?

15        A.   That's correct.  His -- his royalty itself

16   is based on the profits for a day pass, separate and

17   apart from how much data one actually uses for a day

18   pass.

19        Q.   All right.  And so I'm not sure if I have

20   this right, so bear with me here.

21             So you estimated the amount of data used

22   in a day pass is ███ megabytes; is that right?

23        A.   No.

24        Q.   Okay.  I thought I read that in your

25   report.  What do I have wrong about that?

Henderson Legal Services, Inc.

Hansen, John L.                                    February 13, 2019

69

1     **A.    I stated my opinion on a** ▉**-megabyte day**

2  **pass equivalent, but I was looking specifically at a**

3  ▉**-megabyte day pass.  And I assumed that those**

4  **would be between** ▉ **megabytes and** ▉ **megabytes.**

5  **So I didn't use a** ▉**-megabyte and assume that that**

6  **was** ▉ **megabytes of use.  So I had a range of use**

7  **for a** ▉**-megabyte day pass.  And I simply converted**

8  **those amounts to what the equivalent value would be**

9  **for** ▉ **megabytes.**

10    Q.    Okay.  Thank you.

11         Did -- did you calculate a separate

12  royalty that would be due for each of the Accused

13  Devices, that's separate from the royalty you

14  determined based on data usage?

15    **A.    I did not.**

16    Q.    Okay.

17    **A.    That would be, in my view, reflected and**

18  **incorporated into the usage-based rate, based on the**

19  **manner in which the company sells devices and earns**

20  **revenue and profits.**

21    Q.    Let me drill down on that a little bit.

22         So both -- both parties -- all -- excuse

23  me, strike that.

24         All the parties in this case sell devices,

25  correct?

Hansen, John L.                                    February 13, 2019

70

1        A.    That's correct.

2        Q.    And they also sell data, right?

3        A.    That's correct.

4        Q.    And so your opinion does -- doesn't

5    identify specific revenue generated by device sales,

6    does it?

7        A.    Not specifically included in my royalty

8    base, but it's a consideration.

9        Q.    Your royalty base is based on data usage

10   only, correct?

11       A.    Well, that's correct.  But the data, in

12   and of itself, separately have no value without a

13   device.  And my understanding is that these are

14   what's been referred to as a closed system.  So

15   uCloudlink system works with uCloudlink's data.

16   Same thing for Skyroam.  So for every usage of data

17   in the United States, it required an either

18   uCloudlink or Skyroam device, respectively.

19       Q.    All right.

20             Well, let me take the converse of your

21   statement that the data, in and of itself,

22   separately has no value without a device.

23             Given that you've said it's a closed

24   system, would the device have value in and of

25   itself, without the data?

Hansen, John L.                                    February 13, 2019

71

1      A.   I don't believe so, based on my

2  understanding.  And that's consistent with the

3  testimony of Skyroam personnel themselves, who've

4  said we're a -- we're a data company, we're a

5  service company.

6      Q.   And, in fact, that's -- uCloudlink views

7  itself the same way; is that right?

8      A.   That's correct.  There's -- neither party

9  earns profits on the devices; or to the extent they

10  do, it's nominal.

11      Q.   Right.

12      A.   Minimal.

13      Q.   Okay.  And so I know you have more than

14  one disagreement with Mr. Martinez, but at least one

15  of the disagreements that you have is the

16  rate-per-day pass or per megabyte that should be

17  charged in this case; is that right?

18      A.   That's right.

19      Q.   And at the -- the major difference in your

20  ultimate conclusion is, is that Mr. Martinez opines

21  that it's ▮ per ▮ megabytes that should be

22  charged.  And your opinion is ▮▮ per

23  ▮ megabytes; is that fair?

24      A.   As far as bottom line final royalty

25  numbers, that's -- that's a fair comparison.

88

1  if that's true or not?

2      A.   I don't know one way or the other.  As I

3  indicated, I would expect that would be information

4  that they may have.  I don't know that they would

5  have that for all circumstances and for all

6  channels, depending on how the data services were

7  sold or resold to the ultimate user, be it a

8  customer who purchases or a customer rents.  A

9  rental customer's payment information, payment

10 address may not be something that uCloudlink, for

11 example, has access to.

12     Q.   Do you believe that uCloudlink -- excuse

13 me.

14          Do you believe the sale of uCloudlink

15 devices should be included in the royalty base?

16     A.   I do not.  That is not the way in which I

17 quantify damages.  That's not the way in which

18 Mr. Martinez quantified damages either.

19     Q.   And the -- the sale of the device is what

20 you under- -- at least understand as being an

21 infringing act; is that right?

22     A.   My understanding is that it's the device

23 that's accused to infringe.

24     Q.   Would Skyroam take into account, during

25 the hypothetical negotiation, data purchased by

Hansen, John L.                                    February 13, 2019

89

1    customers in the United States even though it may be

2    for somewhere outside the United States, for

3    example, Spain?

4         **A.    Could you repeat that, please?**

5         Q.    Sure.

6              Would Skyroam take into account, during

7    the hypothetical negotiation, data purchased by

8    customers in the United States, even though that

9    data may be used somewhere outside the United

10   States?

11        **A.    I think it's a consideration.   The**

12   **relative importance of the United States market**

13   **versus other markets.   The relative data usage,**

14   **device sales, those are all pieces of information.**

15        Q.    Earlier you used, I believe, the

16   phrase "closed system."

17              Do you recall that?

18        **A.    Yes.**

19        Q.    And so -- and I -- correct me if I get

20   this wrong, but I believe you described meaning that

21   once you buy a Skyroam device you have to use the

22   Skyroam network.   And once you buy a uCloudlink

23   device, you have to use an uCloudlink network, is

24   that sort of a fair example?

25        **A.    Well, you don't have to use it.   But the**

Hansen, John L.                    February 13, 2019

90

1    **Skyroam device would only work with Skyroam data**

2    **services.**

3        Q.   The devices don't work on either other

4    party -- they're not interoperable between the

5    parties' networks; is that right?

6        **A.   That's my understanding.**

7        Q.   Wouldn't that be a consideration of

8    Skyroam during the hypothetical negotiation, the

9    fact that uCloudlink would be making sales in its

10   closed system, as you described it?

11       **A.   That's a consideration for the parties.**

12   **I've talked about the element of competition between**

13   **them, as well as competition with numerous other**

14   **solutions.  But that's why, in my view, the royalty**

15   **in the manner in which I've structured it reflects**

16   **that continuing ongoing potential use.**

17       Q.   Did you specifically call out that

18   consideration by the parties, the fact that a

19   customer may go into another parties' closed system?

20   Do you call that out anywhere in your report,

21   because I didn't see it?

22       **A.   I don't know if I used those words.  It**

23   **certainly was part of my basic understanding.  In**

24   **the description of the companies and the products**

25   **and services they offer, I did talk about services**

Hansen, John L.                                February 13, 2019

93

1       A.   When you say "reasonable royalty

2   determination," I wouldn't -- I wouldn't agree with

3   that characterization.  I didn't include it in the

4   royalty base.  But I was aware of it.  I discussed

5   device profits or device losses.  When I'm looking

6   at the cost structures for the companies, and the

7   profits they would have earned, I am reflecting the

8   fact that they have to sell a device in order to be

9   able to sell services.  So I believe I've considered

10   that and factored that into my determination.  But

11   for purposes of deriving adequate compensation in

12   the form of a royalty, I haven't included it.

13       Q.   So you haven't included device revenue in

14   the royalty base; is that fair?

15       A.   That's fair.  Mr. Martinez viewed it in

16   the same -- largely the same way.

17       Q.   All right.

18            I know you have some disagreements with

19   Mr. Martinez, but you also agree with him on some

20   things, as well, correct?

21       A.   That's correct.  There are some issues

22   where I believe we have similar views.

23       Q.   Yeah, I just want to make sure I

24   understand that.

25            So let's take a look at Mr. Martinez's

Hansen, John L.                          February 13, 2019

99

1    of competitors.  Mr. Plam testified that there are

2    numerous substitute products and services.  And they

3    do compete with Skyroam.  And they're all trying to

4    essentially solve what's been identified as the same

5    problem.  So there are a lot of solutions and it's a

6    highly competitive market.

7        Q.   What do you mean by solve "the same

8    problem"?  What is "the same problem"?

9        A.   The way I would characterize it is, high

10   costs associated with international data roaming.

11       Q.   Do you believe that the parties, both

12   Skyroam and uCloudlink, are commercially successful?

13       A.   I believe they are commercially

14   successful.

15       Q.   All right.

16            I want to ask you about the table 5 in

17   Mr. Martinez's report, the Summary of Skyroam

18   Incremental Day Pass Costs.

19       A.   Table 5 or schedule 5?

20       Q.   Table 5, it's page 47 of Exhibit 2, right

21   under paragraph 132.

22       A.   Okay.

23       Q.   Do you see there's a table 5 that's

24   entitled "Summary of Skyroam Incremental Day Pass

25   Cost."

Hansen, John L.                                    February 13, 2019

177

1    **inventive contribution of the patent, as I**

2    **understand it.  The inventive contribution of the**

3    **patent, as I understand it, relates to the**

4    **enumerated components and then utilizing those to**

5    **establish a local connection on the device.**

6        Q.   Would you agree that the business model

7    for both uCloudlink and Skyroam is not limited to

8    just selling devices; it's about selling data that

9    can be used on the devices they sell, as well,

10   right?

11       **A.   Yes, there's a data service aspect to it.**

12       Q.   And isn't one of the ways that uCloudlink

13   describes it product offering as something called --

14   strike that.

15           Let me -- before I go there, have you ever

16   heard of something called SaaS, software as a

17   service?

18       **A.   Yes.**

19       Q.   Have you heard of something called PaaS,

20   platform as a service?

21       **A.   I have.**

22       Q.   Okay.  And isn't one of the ways that

23   uCloudlink describes its product offering as PaaS,

24   platform as a service?

25       **A.   I have seen a reference to PaaS.**

Hansen, John L.                                February 13, 2019

189

1    what -- what you did.  And I know you want to have

2    your critiques of Mr. Martinez.  I just ask that you

3    listen to the questions.

4           So, in order -- in your opinion, in

5    determining what a reasonable royalty rate is, it

6    was appropriate to go beyond just the profits and

7    costs associated with the selling of the smallest

8    salable practicing unit -- patent-practicing unit?

9        **A.   I wouldn't describe it like that.**

10       Q.   Well, is -- is the way I described it

11   fair?

12           MR. BUSBY:  Objection.

13           THE WITNESS:  I -- that's not how I would

14   describe it.  The profits that are earned by the

15   device that incorporates the smallest salable

16   patent-practicing unit are earned on the service, so

17   that service revenue is attributable to the device.

18   That's how I view it.

19   BY MR. DAVIS:

20       Q.   Okay.  I think I understand now.

21           So this is kind of like a situation where,

22   you know, mobile providers like Verizon will sell

23   you an iPhone for a lot less if you buy their

24   service, but if you just buy the phone outright, you

25   got to pay a much higher rate?

Hansen, John L.                                    February 13, 2019

190

1     **A.    There's some --**

2            **MR. BUSBY:   Objection.**

3            THE WITNESS:  -- similarity in the

4     business model in that the device is ███████████

5     of sorts.  ██████████████████████████████████

6     ████████   ███████████████████████████

7     ████████████████████████████████████████████

8     ████████████████████

9     BY MR. DAVIS:

10        Q.    In the business model of uCloudlink and

11    Skyroam, is the sale of the device ████████████?

12        **A.    That's the term that I just used, yes.**

13    **That's one way to characterize it.**

14        Q.    Does your reasonable royalty analysis

15    differ based on a device that's sold in the United

16    States or sold outside the United States?

17        **A.    My rate is applied to data that's used in**

18    **the United States.  So it isn't specifically tied to**

19    **a particular unit, except for there must have been a**

20    **unit in the United States that was used.**

21        Q.    Okay.  So, for example, if the unit that

22    is used was sold for a much higher price outside of

23    the United States, would that affect your royalty

24    rate at all, for data used in the United States?

25        **A.    I don't believe so.**

Hansen, John L.                              February 13, 2019

239

1                    CERTIFICATE OF REPORTER

2

3               I, Hanna Kim, a Certified Shorthand

4     Reporter, do hereby certify:

5               That prior to being examined, the witness

6     in the foregoing proceedings was by me duly sworn to

7     testify to the truth, the whole truth, and nothing

8     but the truth;

9               That said proceedings were taken before me

10    at the time and place therein set forth and were

11    taken down by me in shorthand and thereafter

12    transcribed into typewriting under my direction and

13    supervision;

14              I further certify that I am neither

15    counsel for, nor related to, any party to said

16    proceedings, not in anywise interested in the

17    outcome thereof.

18              In witness whereof, I have hereunto

19    subscribed my name.

20

21    Dated:  ____ day of _____, 2019

22

23              _____

      Hanna Kim
24    CLR, CSR No. 13083

25