# EXHIBIT 7

CHRISTOPHER MARTINEZ - 02/05/2019

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3

 4   SIMO HOLDINGS, INC.,

 5        Plaintiff,

 6   vs.              Case No.  18-cv-5427 (JSR)

 7   HONG KONG UCLOUDLINK NETWORK

 8   TECHNOLOGY LIMITED, AND

 9   UCLOUDLINK (AMERICA), LTD.,

10
         Defendants.
11   -------------------------------/

12

13

14


15


16   VIDEOTAPED DEPOSITION OF CHRISTOPHER MARTINEZ

17          Tuesday, February 5, 2019

18

19

20
     Reported by:
21    LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC
     California CSR No. 10523
22

23   Job No. WDC-205960

24

25
```

1        BY MR. BUSBY:
2     Q.   Okay.  Thanks.
3          Turn to paragraph 95 of your report,
4    please.
5     A.   Yes.
6     Q.   The last sentence says:
7             "Consequently, I would not expect
8          Skyroam to accept a reasonable royalty of
9          less than the wholesale profits per day
10         pass and the company would expect to
11         forego by licensing vSIM technology to
12         uCloudlink."
13         What does the sentence mean?
14    A.   That I believe that Skyroam, the plaintiff,
15   would require at least the wholesale profit level
16   per day pass as a reasonable royalty.
17    Q.   So are the wholesale profits the ▮
18    A.   Yes, ▮ is the -- is the wholesale profits
19   earned on a day pass, a 500-megabyte day pass.
20    Q.   So can you go to Tab 9, please.
21   Schedule 9, Tab 9.  Skyroam average incremental
22   profit per day pass.
23    A.   Yes.
24    Q.   Okay.  So can you give a layperson, me, a
25   quick review of what -- what's going on here.

1    A.   Yeah.  So basically Schedule 9 to Exhibit 2
2    to this deposition is a summary of how I get to the
3    ▮ profit, and it starts with the ▮ price of the
4    day -- of the wholesale price of the day pass minus
5    approximately ▮ of costs, to get to the ▮ profit.
6    Q.   So the ▮ is rounded up to ▮
7    A.   Right.  That's right.
8    Q.   Okay.  You listed weighted average variable
9    cost per day pass, and there's three things -- three
10   things there.
11        Can you tell me what those are?
12   A.   I mean, they're -- they're reference -- the
13   vSIM cost, the rSIM cost, and the IMSI cost.  And
14   then there are reference to other schedules.
15   Q.   Yeah.  Thanks.
16        What's the rSIM cost?  What is rSIM cost?
17   A.   So since we looked -- it's probably easier
18   to look at the schedules that are referenced.  I
19   think that's where the explanation would be.
20   Q.   I think that's 11.
21   A.   11.  Yeah.  And you want to know what,
22   like, the dollar value of those costs are or the --
23   Q.   No.  Just what is rSIM?  Sorry.
24   A.   Oh, it's just a -- it's another component
25   cost that's required to provide the service.

1    Q.   And I think I know, but what's vSIM cost?
2    What's is a vSIM?
3    A.   That's the virtual SIM cost.  That's --
4    that's basically the bulk of the data.
5    Q.   What's IMSI cost?  What is IMSI?
6    A.   Again, I don't recall what IMSI stands for,
7    but it's another component cost that's incurred by
8    Skyroam or uCloudlink to provide the service.
9    Q.   What other -- did you consider any other
10   costs when you -- you came up with the ▬▬▬▬
11   royalty?
12   A.   No.  I considered the cost -- basically,
13   the cost of goods sold.  The direct costs.
14   Q.   No operational costs?
15   A.   No.  I concluded only the cost of goods
16   sold.
17   Q.   Why didn't you consider operational costs?
18   A.   Because I didn't consider them to be
19   incremental to the sale of the day -- the wholesale
20   day passes.
21   Q.   What do you mean by that?
22   A.   I didn't consider the cost to be
23   incremental.  If you're already selling -- if you've
24   already sold a piece of hardware, a hotspot, and you
25   maybe have already sold a day pass or two, there

1    Q.  Okay.  Does paragraph 95 assume that every
2  uCloudlink sale is a lost sale for Skyroam?
3    A.  It doesn't necessarily assume that, but I
4  do talk about the zero-sum game analysis and the
5  nature of the market, so -- but, no, the royalty
6  is -- is fee that uCloudlink, the defendant, would
7  pay to use the protected technology.
8    Q.  Okay.  So, I apologize.  I'm not sure if I
9  understood your answer.
10       Yes or no -- I think you might have
11  answered.  I'm sorry.  Does this paragraph assume
12  that -- is there an assumption that every uCloudlink
13  sale is a lost sale for Skyroam?
14       MR. SOSKIN:  Objection.
15       THE WITNESS:  Well, this paragraph doesn't
16  assume it.  What I'm saying is that -- here, I'm
17  saying that uCloud -- or SIMO or Skyroam would
18  expect a royalty of no less than its wholesale
19  profit level.  That's what -- that's what I'm saying
20  here.
21       BY MR. BUSBY:
22    Q.  If you look at -- well, do you say anywhere
23  else in your opinion -- I know you talked about
24  zero-sum game.
25       Is the zero-sum game what I described as a

1     Q.   Is the business model for uCloudlink or
2  Skyroam enabled by any other technology?
3          MR. SOSKIN:  Objection.
4          THE WITNESS:  Well, there's technology in
5  the hotspots that relates to Wi-Fi, so there's going
6  to be some standard essential patents and other
7  patents that go into the hotspots.  But that's
8  really not the business model of these parties.
9  They don't make their money on their hotspot
10 devices.
11         They make their money and their business
12 models are centered around selling data usage via
13 these day passes.  But they require some sort of a
14 hardware device.
15         BY MR. BUSBY:
16    Q.   Does the hardware include ▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18         MR. SOSKIN:  Objection.
19         THE WITNESS:  Yes, I believe the
20 uCloudlink -- yes.  Short answer.
21         BY MR. BUSBY:
22    Q.   How about the Skyroam products?
23    A.   I know they have ▮▮▮▮▮▮▮.  I don't
24 know what all the -- I don't know what's in them.  I
25 know that, for instance, Skyroam ▮▮▮▮▮▮▮

1  ████████████████████████████████████, but I

2  don't know the composition of those devices.

3     Q.   Did you take into account any patented

4  technology by ███████ with respect to your opinions

5  formed in your report?

6        MR. SOSKIN:  Objection.

7        THE WITNESS:  It's my opinion that the

8  hardware devices aren't a portion of the base in a

9  reasonable royalty analysis, so I have not included

10 those.  Therefore, it would be inappropriate to

11 include other technologies that relate to the

12 hardware devices.  The royalty base does not -- does

13 not include the hardware devices.

14       BY MR. BUSBY:

15    Q.   Are there any other technologies that you

16 took into account with respect to your royalty base?

17    A.   Well --

18       MR. SOSKIN:  Objection.

19       THE WITNESS:  -- I have an understanding

20 that, for instance, there's a technology in the SIM

21 cards.  But that technology is accounted for in the

22 value chain when the SIM cards are purchased from

23 the mobile network operators.  So I understand it's

24 there.  And that becomes a cost in the value chain

25 to the wholesaler, like uCloudlink or Skyroam.

```
 1          THE WITNESS:  I would imagine -- again, in
 2   the hotspot device, there's probably memory
 3   involved.
 4          BY MR. BUSBY:
 5      Q.  How about antennas?
 6          MR. SOSKIN:  Objection.
 7          THE WITNESS:  Yes.  Likely in a hotspot
 8   device, most of them that I've seen require
 9   antennas.
10          BY MR. BUSBY:
11      Q.  And a Wi-Fi device is a wireless device;
12   correct?
13          MR. SOSKIN:  Objection.
14          THE WITNESS:  Yeah.  Wi-Fi is a wireless
15   device typically or facilitates wireless
16   communication.
17          BY MR. BUSBY:
18      Q.  So wouldn't be common sense that the
19   antenna technology would be very important for a
20   hotspot device, as you call them?
21      A.  Well, there's a lot --
22          MR. SOSKIN:  Objection.
23          THE WITNESS:  Again, I don't doubt that all
24   of the technology that's contained in the device is
25   important.  I want to make it clear that I'm not
```

1   including the hardware device in my royalty base, so
2   there's no need for apportionment.
3         BY MR. BUSBY:
4     Q.  Okay.  Can you please turn to paragraph 73.
5     A.  Sure.
6     Q.  So in paragraph 73, you said:
7           "As part of the hypothetical
8        negotiation, it's also important to
9        consider any necessary apportionment
10       which relates to the essential
11       requirement that the 'ultimate reasonable
12       royalty award must be based on the
13       incremental value that the patented
14       invention adds to the end product.'  And
15       'where multicomponent products are
16       involved, the governing rule is that the
17       ultimate combination of royalty base and
18       royalty rate must reflect the value
19       attributable to the infringing features
20       of the product.'"
21    A.  Yes.  I see that.
22    Q.  Did you -- I think you just testified, you
23  didn't apply apportionment in this case?
24    A.  Well, I -- I isolated the value add related
25  to the '689 patent as it pertains to the business

1   model for the two parties, and I was able to isolate

2   the profit earned on the wholesale sale of day

3   passes.

4         So I did not include -- so my royalty base

5   are day passes.  There is no hardware component to

6   those day passes with the exception of the actual

7   SIM cards that are purchased from the mobile network

8   operators.  So there's no need to apportion the

9   hotspot hardware because the hotspot hardware is not

10  part of my royalty base.

11      Q.  What is the infringing -- what is the

12  accused product?  Is the accused property a GlocalMe

13  device, or is it day pass card?

14         MR. SOSKIN:  Objection.

15         THE WITNESS:  Well, again, I'm not here to

16  offer an opinion on what infringement is or isn't.

17         BY MR. BUSBY:

18      Q.  I'm asking -- I'm sorry.  Go ahead.

19      A.  But, broadly speaking, you -- it's -- it is

20  necessary to have a hotspot device to use the day

21  pass.  I'm simply saying that the hypothetical

22  license based on the business models is that the

23  revenue is earned and the business models revolve

24  around selling the day passes.

25         It's the same model as buying a printer,

1   ███████████████████████████ people chose
2   the ones that they applied, and the lowest one is
3   innovative virtual SIM at █ percent; isn't that
4   true?
5       A.  I mean, yeah, I -- again, I don't know
6   anything about this document, but -- there's a
7   sample size of ████████ or respondents, and these
8   seem to be the ████████████  And I don't
9   know if there were more choices.  I just have no
10  idea.  I don't know anything about this survey.
11      Q.  Okay.  But if you had reviewed this
12  document, wouldn't that be important for you to know
13  that a survey showed that innovative virtual SIM is
14  the ████████ attribute these customers liked?
15  Isn't that information that you would want to know?
16          MR. SOSKIN:  Objection.
17          THE WITNESS:  Well, it's interesting,
18  again, based on what I understand about this
19  technology.  This virtual SIM facilitates some of
20  these other things.
21          So, for instance, if I said, you know, "Do
22  you like that whiz-bang processor in your iPhone,"
23  you might not rank that very high because you don't
24  understand that that facilities the use of FaceTime
25  or the use of some other app that you love.

1      It's the technology underneath the app, and
2  I don't know how many people, from a consumer
3  perspective, appreciate the technology.  They really
4  appreciate the feature.  The vSIM -- virtual --
5  innovative virtual SIM is not a feature.  It's an
6  element of the product.
7      BY MR. BUSBY:
8      Q.  It's a patented technology, according to
9  your report, isn't it?
10     A.  Yeah.  It's an element of the product.
11  It's not a feature, per se.
12     Q.  So these consumers were asked "What are the
13  most important reasons you purchased the Skyroam
14  hotspot?"  Doesn't this indicate to you, as a
15  damages expert, that the [redacted] for these
16  consumers was the patented virtual SIM technology?
17         MR. SOSKIN:  Objection.
18         BY MR. BUSBY:
19     Q.  That's what it says on paper.  Isn't that
20  what it says?
21     A.  Again, I have no dispute with you,
22  literally.  I would say that some of the virtual SIM
23  technology facilitates these other features.  So
24  it's sort of like, you know -- they're not
25  necessarily apples to apples.

1    A.   So I would simply use Skyroam's statistics
2  presented in this Exhibit 15 and assume that
3  uCloudlink would have the similar experience in
4  terms of selling its day passes to its customers.
5        So you could simply multiply maybe one of
6  these numbers, ▓▓ or ▓▓ times the ▓▓▓▓ hotspots
7  sold by uCloudlink to get an estimation of accused
8  day passes sold related to hotspots sold in the
9  United States.
10    Q.   Okay.  And looking at page 1 of 3 of your
11  report or -- I guess it's Schedule 3, is this
12  document in Schedule 3 of your report?  And we're
13  looking at -- I believe this is Exhibit 2.
14    A.   Yes.  It's -- yeah.  This document is in a
15  Bates range that's included in my Schedule 3 to
16  Exhibit 2.
17    Q.   Okay.  And when formulating your opinions
18  in this case, did you consider this document?
19    A.   I did, yes.
20    Q.   So if you were to include the hotspots
21  themselves into your damages calculation, would you
22  have a separate royalty rate for the hardware, or
23  would you include it as part of the -- as part of
24  one royalty with the -- with the data?
25    A.   You could -- I guess you could conceivably

1   do it either way.  You could take the life value of
2   the hotspot and day passes and then do an
3   apportionment and then calculate a royalty for that.
4           The problem there is that the royalty would
5   likely be so large, because if you have, on average,
6   ▇ day passes sold on top of the value of the
7   hardware, you're -- it's probably not tenable to the
8   licensee, the defendant in this case.
9       Q.  So how would it affect the hypothetical
10  negotiation if you did that?
11      A.  Well, you would make the licensee actually
12  worse off, because you would basically force the
13  licensee to pay a very high royalty rate based on
14  the value of the -- a bigger royalty rate based on
15  the value from both the device and all of the
16  expected day passes.
17          And they'd have to pay that when they sold
18  the device.  So there would be a shift of payment
19  that would be upfront that the licensee, the
20  defendant, would be responsible for, which I'm sure
21  they wouldn't be happy about.
22      Q.  If you were to omit the data use from your
23  royalty calculation, would the -- would such a
24  royalty adequately compensate SIMO for the
25  infringement of its patent?

1   A.   You mean include just a royalty on the
2   hardware sold by uCloudlink?  Just to be clear.
3   Q.   Just the royalty on the hardware sold by
4   uCloudlink and not the -- not the data.
5   A.   Well, then, again, your royalty would have
6   to consider the benefit of the technology, which
7   would include the profits earned on the day passes.
8   And that royalty would probably be a very large
9   percentage or a big percentage of the hardware cost
10  which, again, would probably be untenable to the
11  licensee.
12  Q.   So if you omitted -- similar to the
13  decision to exclude the hardware from your current
14  calculation, if you were to exclude the data sales
15  and just discuss the hardware sales, would SIMO be
16  made whole for the losses stemming from the
17  infringement if you just -- just analyzed the
18  sales -- royalty based on the sales of the hardware?
19  A.   Well, if you didn't include the profit on
20  the day passes, then, no, because you would have to
21  apportion down the value of the other technology in
22  the device, and -- and SIMO would not recover the
23  benefit derived by the defendant from selling day
24  passes subsequent to the sale of the hardware.
25       MR. SOSKIN:  I think that's all I got.

| | |
|---|---|
| 1 | REPORTER CERTIFICATE |
| 2 | I, LORRIE L. MARCHANT, Certified Shorthand |
| 3 | Reporter, Certificate No. 10523, for the State of |
| 4 | California, hereby certify that CHRISTOPHER MARTINEZ |
| 5 | was by me duly sworn/affirmed to testify to the |
| 6 | truth, the whole truth and nothing but the truth in |
| 7 | the within-entitled cause; that said deposition was |
| 8 | taken at the time and place herein named; that the |
| 9 | deposition is a true record of the witness's |
| 10 | testimony as reported to the best of my ability by |
| 11 | me, a duly certified shorthand reporter and a |
| 12 | disinterested person, and was thereafter transcribed |
| 13 | under my direction into typewriting by computer; |
| 14 | that request [ ] was [ X ] was not made to read and |
| 15 | correct said deposition. |
| 16 | I further certify that I am not interested |
| 17 | in the outcome of said action, nor connected with, |
| 18 | nor related to any of the parties in said action, |
| 19 | nor to their respective counsel. |
| 20 | IN WITNESS WHEREOF, I have hereunto set my |
| 21 | hand this 6th day of February, 2019. |
| 22 | |
| 23 | _____ |
| 24 | LORRIE L. MARCHANT, RMR, CRR, CCRR, CRC<br>Certified Shorthand Reporter #10523 |
| 25 | |