j4o1simc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   SIMO Holdings Inc.,

 4                  Plaintiff,

 5          v.                              18 Civ. 5427 (JSR)

 6   uCLOUDLINK (AMERICA) LTD., et
     al.,
 7
                    Defendants.            Conference
 8
     ------------------------------x
 9                                         New York, N.Y.
                                           April 24, 2019
10                                         4:30 p.m.

11   Before:

12                       HON. JED S. RAKOFF,

13                                         District Judge

14                         APPEARANCES

15   K&L GATES LLP
          Attorneys for Plaintiff
16   BY:  HAROLD H. DAVIS, ESQ.(SF)
          GINA A. JENERO, ESQ.(IL)
17        MATTHEW J. WELDON, ESQ.(NY)

18   MORGAN, LEWIS & BOCKIUS LLP
          Attorneys for Defendants
19   BY:  JASON C. WHITE, ESQ. (IL)
          ROBERT W. BUSBY, JR., ESQ. (DC)
20        SHAOBIN ZHU, ESQ. (CA)

21

22

23

24

25
```

j4o1simc

1              (Case called)

2              THE DEPUTY CLERK:  Will everyone please be seated, and

3      will the parties please identify themselves for the record.

4              MR. DAVIS:  Good afternoon, your Honor.  Harold Davis

5      of K&L Gates, and with me here today is Ms. Gina Jenero and

6      Mr. Matt Weldon.

7              THE COURT:  Good afternoon.

8              MR. WHITE:  Good afternoon, your Honor.  Jason White

9      for uCloudlink.  With me is Bob Busby and also Shaobin Zhu.

10             THE COURT:  Good afternoon.

11             All right.  I'm very much looking forward to the trial

12     next week.  You'll be glad to know that in the criminal trial

13     that I have ongoing before me now, we will have summations

14     tomorrow, the jury will start their deliberations on Friday, so

15     I'm confident that case will be over before we start your case

16     on May 1st.  Also, I will get you by no later than tomorrow my

17     opinion, explaining the reasons for my rulings on summary

18     judgment.

19             So I received a bunch of questions that you wanted to

20     raise here, which seem to me to suggest that you thought that

21     all the courts of the United States tried cases the way they do

22     in California.  Not true.  So let's just go over a few things.

23             First, selection of the jury.  I use the old jury box

24     method.  We will select a jury of eight.  We'll put eight in

25     the box.  I will question them for cause.  And then we'll have

j4o1simc

peremptory challenges, three challenges per side, which are

done in rounds.  My courtroom deputy will hand a board with the

cards from each of the eight jurors to plaintiff's counsel,

you'll exercise your first challenge, you'll hand the board to

defense counsel, they'll exercise their first challenge, and

we'll do that for three rounds.  If you waive your challenge in

a given round, you don't lose your remaining challenge; you

just lose that challenge.  But if both sides waive in a given

round, of course, then we have the jury.  So, any questions

about that?

          Okay.  In terms of opening, how long does plaintiff

want for opening statement?

          MR. DAVIS:  I think 30 minutes or less.

          THE COURT:  That is the maximum.  I never give more

than 30, so 30 it is.

          How about defense counsel?

          MR. WHITE:  That's fine for us as well, your Honor.

          THE COURT:  Very good.

          We will normally sit 9:30 to 12:30 and then 1:30 to

3:30.  The one exception will be May 1st, when I have to give a

speech in the afternoon, so we'll have selection of the jury

and opening statements.  We might get into the first witness,

but I'm not sure about that.  But certainly we'll just go in

the morning, so we'll conclude after the morning session.  But

normally we'll sit with the jury 9:30 to 3:30, with a 15-minute

4

j4o1simc

1    break at 11 and a one-hour lunch break between 12:30 and 1:30.

2    So, any questions about that?

3         Good.  Now the first question in the letter that my

4    clerk got was:  "We would appreciate clarification on how the

5    Court counts time."  Well, on my fingers, of course.  But I

6    don't set time limits unless things get out of hand.  So I may

7    ask you, with respect to your next witness:  How long do you

8    think you'll be on direct?  If cross seems to be going on

9    inordinately long, I may ask:  How much more do you have on

10   cross?  And those will be, you know, reasonably binding

11   estimates, so err on the side of caution when you respond.  But

12   I won't say you only have ten minutes left, unless I really

13   think things are going on endlessly.

14        Question:  "Does the Court keep the official time or

15   do the parties reach agreement on the time themselves?"  Well,

16   as you can see, that's moot from what I just told you.

17        Question:  "Does the Court prefer that all exhibits

18   are admitted into evidence as they are used with the witness or

19   at the end of the witness's examination?"  Answer:  When they

20   are used with the witness.  So what you should do, while you're

21   free to supply me with copies of the exhibits in advance,

22   frankly, and that's what I used to require, but frankly, I

23   think it's easier just when you introduce an exhibit, give a

24   copy to your adversary -- you will have already, of course --

25   and give a copy to my clerk, and then give the original to the

j4o1simc

witness.  Now some of this will be done electronically as
opposed to physically, but the same idea.

"What is the level of foundation that needs to be laid
in order to introduce an exhibit into evidence?"  No more and
no less than is required by the federal rules.

"How does the judge handle impeachment?"  Now we
shouldn't allow politics to get into this case.

But then the follow-up question was:  "Does the Court
need to see the testimony before it is used?  Can the testimony
be published to the jury?"  See, that's the California style.
That's not the style here.  You put a witness on the stand.
You do the direct; just the same way, you do the cross.  If
there are objections, you make your objections and I rule.  And
then we have the cross and then we have the redirect.
Sometimes we'll have recross.  So no written stuff, no written
testimony.  You just put your witnesses on the stand.

"Can video testimony be played?"  So if there is an
unavailable witness who has been deposed or whose testimony has
otherwise been taken, then you need to submit to me, at least
24 hours before you intend to play the video, a marked-up copy,
hard copy of the transcript with any objections so I can rule
on any objections.  And I'll get that to you promptly after
it's handed up.

And the way I like to see that is, on the pages of the
transcript, the proponent maybe marks in the margin, let's say

j4o1simc

1     in blue, the lines that they're planning to play, and then in

2     the margin right alongside, anyone who's objecting, the other

3     side notes their objection.  You can note your objection either

4     in words or you can do it by numbers in the Federal Rules of

5     Evidence.  Either one is acceptable.  And then I'll rule and

6     you can redact the video accordingly.

7          But this only applies to unavailable witnesses.  So

8     for example, if there is a witness who's on both the

9     plaintiff's and the defendant's lists as a live witness, at

10    least one side is quite sure they can procure the attendance of

11    that witness, so we'll have that witness.  No witness will be

12    called twice.  So whoever calls him first calls him first.  If

13    it's a hostile witness, you can proceed by cross-examination

14    and so forth.

15         So I'll give you an example of how that would

16    typically work.  So the plaintiff might call a hostile witness

17    from the other side because you think you want to make certain

18    elements of your case.  So you put that guy on the stand, you

19    cross-examine him, in effect, because he's hostile, and you can

20    then have leading questions.  The defendant then is not bound

21    by the scope of that examination, because you've already put

22    him on your list, and so the defendant can now question him as

23    if on direct and also responding to what came out in the

24    plaintiff's testimony.  Okay?  Any questions about that?

25         MR. DAVIS:  Yes, your Honor.  Two questions for us.

j4o1simc

First is, our expert witness, our technical expert witness, we
will have a rebuttal case on validity, and so the question I
have is that that witness would have to come up twice.
Generally he comes up after they present their invalidity case,
rather than our witness affirmatively putting in his validity
opinions before they've even put up their invalidity case.  So
to put a fine point on it, our witness will be Dr. Clark, and
Dr. Clark will present his testimony in our case in chief, but
because we're not even sure exactly what they're going to say
on invalidity, and it's their burden of proof, it's their
issue, we would then have a rebuttal case and bring Dr. Clark
back a second time to testify on validity issues.

          THE COURT:  Well, I'm not foreclosing that, but I
don't see why your adversary isn't prepared to tell you in
advance exactly what they're going to say in that regard and
then he can testify when you call him as to everything.  Any
problem with that, for the defense?

          MR. WHITE:  I think we've already identified the
invalidity positions that we're going to put on, so I think we
have done that.  We have no objection to them calling him
twice, or re-calling him, if you will, on the rebuttal case.

          THE COURT:  Well, if you have no objection.  I
certainly would not allow that for any witness other than an
expert witness in this particular burden-shifting situation,
but I will allow it there.

8

j4o1simc

```
1              Okay.
2              MR. DAVIS:  And then I just had one other question --
3              THE COURT:  Yes.
4              MR. DAVIS:  -- which is about an unavailable witness
5   on the video.  So I understand, for a physical witness, we
6   don't call them twice, but we each have say separate
7   designations for the witnesses.
8              THE COURT:  Yes.
9              MR. DAVIS:  So when we play that video --
10             THE COURT:  No, no.  You play it once.  So what
11  happens there is, you've marked in the margin, say with blue
12  line what you want to have played, they'll mark in the margin
13  with a red line what they want played.  They'll put their
14  objections in the margin alongside your blue line, you'll put
15  your objections to theirs alongside their red line.  And
16  occasionally you may want to say, one side or the other:  If
17  the objection is overruled, then we request the following lines
18  for completeness, and those you can do in a green marker.  So
19  this will be more fun than the sandbox.  But that's the easiest
20  way for me to do it.  And you can get me those even before 24
21  hours.  I just need a minimum of 24 hours to do those rulings.
22             MR. DAVIS:  And just one final question on that.
23             THE COURT:  Yes.
24             MR. DAVIS:  We are not sure what witnesses they're
25  bringing live.  They've indicated that they have three
```

j4o1simc

1    witnesses, corporate representative fact witnesses that may

2    either appear live or by deposition designation.

3            THE COURT:  Well, they need to tell you that before

4    May 1st.

5            MR. DAVIS:  Okay.  Part of the issue is that we need

6    to -- they speak Mandarin, and so if we don't know in

7    sufficient time, we can't have an interpreter here, and we've

8    asked them repeatedly to tell us -- and they've declined to do

9    so -- who's actually going to show up here at trial.

10           THE COURT:  Well, we're in Chinatown.  If you want a

11   Mandarin translator, we can find dozens here.  But is there any

12   reason you can't tell them say by the end of this week?

13           MR. WHITE:  By the end of this week, we might be able

14   to do that.  We're waiting to see what your ruling says.

15   That's going to affect --

16           THE COURT:  Yes, you'll have that tomorrow.

17           MR. WHITE:  Once we see that, we'll work with them and

18   try to work it out with them.

19           THE COURT:  So hopefully you'll know by the end of

20   this week, and in any event, certainly they should inform you

21   of that no later let's say than April 30th, absolute worst

22   case.

23           MR. DAVIS:  Okay.  Thank you, your Honor.

24           THE COURT:  All right.  Let's see.

25           "With respect to the jury, when will we get access to

j4o1simc

1   the jury pool information?"  Answer:  Never.

2              "And how will we get such information?"  Answer:  You

3   can't.  Welcome to New York.

4              Next question:  "Does the Court email us in advance or

5   do we need to affirmatively ask for it or send someone to the

6   court?"  You can ask for it.  The request is denied.

7              "Will the parties be permitted to ask any question to

8   the potential jurors?"  No.

9              So how does it work?  Under my rules, you need to

10  submit this fairly soon, your proposed questions, and I will

11  select from those questions those that I think are appropriate.

12  I am of the general philosophy that jurors are doing a

13  tremendous service at considerable inconvenience when they come

14  to serve on a jury, and I'm not going to impose on them

15  intrusive questions.  So if you have questions of the kind that

16  I sometimes see, either sociological questions -- "What

17  newspapers do you read? What television shows do you watch?" --

18  or questions that are more ideological or attitudinal -- "What

19  do you think about patent lawyers?" -- and of course I would be

20  shocked to ask that question in any event because who knows

21  what the answer might be -- I don't ask those kind of

22  questions.  I ask the questions that are necessary to determine

23  whether someone needs to be excused for cause.

24              Okay.  Sequestration questions.  "The parties

25  anticipate expert witnesses reviewing witness testimony,

j4o1simc

1   including testimony at trial, in their opinions.  If necessary,

2   please confirm experts will not be sequestered."  Wrong.  They

3   will be sequestered, because the federal rules were amended,

4   what, now 20 years ago, to say that an expert cannot testify to

5   anything beyond what's in his report.  So the old-fashioned

6   style of having the expert sit there and then comment is no

7   longer, in my view, permitted under the federal rules.

8           "The parties expect fact witnesses will be sequestered

9   until after their testimony."  That's right.

10          "Will those apply to corporate representatives who are

11  testifying as well?"  So the rule in this district for all

12  judges is, you may have at counsel table one corporate

13  representative, even if he or she is going to testify, but only

14  one.  So pick your victim accordingly.

15          "Will the corporate witnesses be required to leave

16  when the confidential information of the opposing side is

17  presented to the jury?"  What confidential information?  You

18  may recall my protective order when I alerted both sides to the

19  fact that the likelihood that I will seal anything borders on

20  zero.

21          MR. DAVIS:  So for the plaintiffs, the only part of

22  our confidential information that may come up I think would be

23  during our damages presentation, there might be discussion of

24  some of our profit margins and sales --

25          THE COURT:  Oh, my god.

j4o1simc

1          MR. DAVIS:  -- and things like that.

2          THE COURT:  Have you alerted the CIA to this?  I'm

3   sure the Russians are very interested in finding this out.

4   They'll probably send several representatives.

5          Very unlikely I will seal that.

6          MR. DAVIS:  Understood, your Honor.

7          THE COURT:  Okay.  "Does the Court have any

8   restrictions on attorney movement during questioning -- must

9   stand at the podium, etc.?"  Rap dancing is not encouraged.

10         Here's what I will allow.  During opening statements

11  and during summations, you can stand at the jury box, as long

12  as you leave like 6 inches.  I don't want you really putting

13  your head into the jury box, but you can go up to the jury box.

14  But during questioning of witnesses, it has to be done from the

15  rostrum back there.

16         We talked about depositions and live testimony.

17         So you say, though, "We would like clarification as to

18  whether the fact that a party is bringing a witness live

19  absolutely precludes either party from playing any of that

20  witness's deposition testimony by way of designation whether or

21  not the witness is a 30(b)(6) witness."  The answer is:  Yes,

22  you're precluded.  He's there on the stand.  Sometimes a

23  question comes up, well, we're still on the plaintiff's case,

24  the plaintiff wants to have certain things brought out.  That's

25  why you get to call him even if he's a hostile witness.  But

j4o1simc

1   there is no reason to be playing depositions.  Of course you

2   can play depositions for impeachment purposes.  Let me go over

3   that for a minute.

4          So you have the witness on the stand and you've asked

5   him:  "How much did you pay for that widget?"  And he says,

6   "$4."  And at his deposition, the terrible liar said 3.99.  So

7   you can really do it in one of two ways.  You can either just

8   say to him, "Didn't you say at your deposition 3.99?"  And if

9   he admits it, then you don't need to read the deposition.  Or

10  you can just go to the deposition.  But when you go to the

11  deposition, you do it this way:  "Your Honor, I propose to read

12  page 44, lines 7 to 9."  And you pause for ten seconds because

13  if your adversary has an objection, that's the time to make it.

14  The only objection would be, "It's not impeachment."  So if

15  there is an objection, I'll rule.  If there's just silence

16  after ten seconds, you can proceed and read question and answer

17  to the witness and then ask him whatever you want about it,

18  like, "Wasn't that a bald-faced lie?"  To which, if he was

19  giving an honest answer, he would say, "Counsel, have you ever

20  been a witness at a deposition?  I wouldn't wish it on my worst

21  enemy."

22          Okay.  I think that's all the questions on your list,

23  but what other questions or matters does anyone want to raise?

24          MR. DAVIS:  Regarding the logistics, one question we

25  had -- and we've seen it differently depending on courts'

j4o1simc

1    preferences -- when we have a witness come up to the stand, we

2    have a brief introduction, this is so and so, he's the CEO or

3    whatever of this company, and he --

4            THE COURT:  No, no.  We don't do it that way.  We'll

5    swear him in, and you can ask him.  Of course it is perfectly

6    proper to ask questions about his background, you know:  "What

7    do you do for a living?"  "A.  I'm a CEO."  "Q.  You couldn't

8    do any better than that?"  So, okay.

9            MR. DAVIS:  Same question for video, because sometimes

10   they don't have context.  And do you want to --

11           THE COURT:  Well, on the video, you should be sure to

12   give me the portion of the video that tells the jury who this

13   person is.

14           MR. DAVIS:  Understood.

15           THE COURT:  All righty.

16           MR. WHITE:  Two questions from us, your Honor, if we

17   may.

18           THE COURT:  Yes.

19           MR. WHITE:  For experts, when we're qualifying an

20   expert, do we tender them as an expert or will you --

21           THE COURT:  No.  I'm very glad you raised that,

22   because in the Second Circuit, that's a forbidden thing, though

23   in other circuits it's allowed.  The reason it's been

24   forbidden -- and it's not my rule, although I happen to agree

25   with it, but it's the Second Circuit's rule -- is because it

15

j4o1simc

gives the jury the impression that you're signing off that this
person is an expert, which is really only their determination
to make, and all you're really doing is saying that he or she
meets the threshold requirements to possibly qualify as an
expert witness.  So you lay your foundation, "What do you do
for a living?"  And one related question -- and this is my
rule -- I don't want the question, "Have you been certified by
the courts in some other case?" because I think that has the
same danger.  And after you've asked all your foundational
questions, if the other side has an objection, then you'll
raise that at the sidebar.

           And I should mention about sidebars.  So when you have
an objection to a question, normally you'll just say
"objection" and one or two words, like "403" or "foundation."
No speaking objections.  If, as occasionally is necessary,
there's some reason why you really need to have a sidebar,
either because the objection is fairly complicated, "Judge,
this was something that we thought we had worked out with our
adversary two months ago and we think they're not true to what
we worked out," or something like that, or simply because you
feel the need to make a record on a particularly important
objection, ask for a sidebar, and I usually grant those.  Once
in a while, if I think it's getting out of hand, I will deny
sidebars and you can take it up at the next break, but usually
I grant those.  But I don't want speaking objections in front

j4o1simc

1   of the jury is my point.

2              MR. WHITE:  Understood.  One other question was:  Is

3   it your preference to play the patent video from the federal

4   judiciary?

5              THE COURT:  I'm sorry?

6              MR. WHITE:  Is it your practice to play the video that

7   comes from the federal judiciary?

8              THE COURT:  Yes.  Thank you for reminding me.  That's

9   a great idea.  We should have a copy somewhere, but why don't

10  you work with my law clerk to have that available and we'll

11  play that early on for the jury.  That's an excellent thought.

12             All right.  Anything else?

13             MR. DAVIS:  Yes, your Honor.  We had indicated that we

14  wanted to bring to the Court's attention our request to -- it's

15  twofold.  One, to present testimony about the sale of

16  international data plans; and to request the actual data from

17  the defendants on that issue.  We have a short presentation, a

18  slide show.  It's four or five slides.  But I can talk to you

19  about it rather than going through that formality.

20             THE COURT:  Well, as I understand it -- now correct me

21  if I have this wrong -- your argument was that even though

22  something that occurred totally abroad would not be part of

23  your damages, if their purchase occurred in the US, then it

24  might be part of your damages.  But don't you already have the

25  total US sales figures?

j4o1simc

1          MR. DAVIS:  We have the US sales figures, but what we

2     don't have is if you commit an infringing act in the United

3     States, which is the purchase of the hardware device, but then

4     you use that hardware device to buy a data plan abroad, that is

5     harm to us, and that's the *WesternGeco* case and also the *Power*

6     *Integrations* case.  What those cases have recently held is that

7     foreign damages, damages that occur abroad, are recoverable if

8     it's tied to a US infringement.  And so the infringement occurs

9     here, the sale of the device occurs here, but in this situation

10    someone will buy the device here in the United States, travel

11    to London, and then buy a data plan in London.  We don't have

12    that data of the data plan; we don't have any records of the

13    data plans sold abroad.

14          THE COURT:  All right.  Let me go to your adversary,

15    see what he says about that.

16          MR. BUSBY:  Your Honor, this was letter briefed pretty

17    extensively in January, and as your Honor seems to recall, this

18    request, the exact request, was denied.

19          THE COURT:  Yes, but I said without prejudice.  It's

20    fair game for them to reraise it.

21          MR. BUSBY:  Right, your Honor.  So first of all --

22          THE COURT:  The point is, nothing's happened.  In your

23    view, the law hasn't changed.

24          MR. BUSBY:  The law has not changed, and as your Honor

25    noted, infringements in the United States -- here's what we

j4o1simc

1    have produced.  We've produced all data packages, globally,

2    that have any portion of their data package that could be used

3    in the United States.  We've produced all flow data which could

4    show any data usage in the United States.  And again, they're

5    apparatus claims, but their expert's theory is based off data

6    usage, and that's another day for the hearing, the trial next

7    week.  And we've produced all sales of any devices in the

8    United States.  So any infringing act in the United States is

9    absolutely covered.  So again, that's been briefed, that's been

10   ruled on.  They have all that data.  We've produced actually --

11         THE COURT:  So assuming, for the sake of argument,

12   their interpretation of the *WesternGeco* case -- if I'm

13   pronouncing that right -- just assume that for the sake of

14   argument; have you produced everything that they would need to

15   show these damages under that case?

16         MR. BUSBY:  Well, I haven't reviewed it recently.

17   This is a surprise to me, but --

18         THE COURT:  All right.  That's fair enough.

19         MR. BUSBY:  Our understanding of the law is, any

20   infringing act by the sales of an apparatus device that occurs

21   in the United States is covered, and then some.  And other than

22   that, we supplemented the data from September 2018 to December

23   2018.  There's an issue on that as well, if your Honor gives me

24   time after this.  But our view is, we've produced them more

25   than enough information for infringing acts in the United

j4o1simc

```
1    States.  My general understanding of that law is, you have to
2    have pretty clear evidence that the act that occurred in the
3    United States -- and I'm going on memory here, your Honor,
4    but -- the act that occurred in the United States has to
5    clearly show that, somehow, that the act that occurred
6    internationally is clearly tied to the United States.  There is
7    no evidence on that, and again, any action of infringement in
8    the United States has been more than covered.
9              MR. DAVIS:  To the last point, your Honor, that's
10   exactly what we've alleged.  But for the infringing act, the
11   sale of these infringing devices, they wouldn't have the sale
12   of the data plans.  Both of the damages experts here agree that
13   you look at data plans sales, not the sale of the devices, for
14   damages, because these are loss leaders.  No one sells the
15   devices for profit.  It's like if you buy your cellphone
16   from --
17             THE COURT:  I understand.
18             MR. DAVIS:  Right.  And so anyway, we looked at those,
19   we look at the data plan sales.  But for that sale, because
20   it's a closed system, you can't use another device with these
21   data plans.
22             THE COURT:  So what is it you think, under your
23   approach, you would need that you don't have now?
24             MR. DAVIS:  We have two approaches.  One, what we'd
25   like is, if you sell the device here in the United States to
```

j4o1simc

Joe Smith, Joe Smith then goes to London and buys a data

package in London, that is the information we don't have.  They

never provided those records.  They only provided data package

sales that occurred in the United States.

THE COURT:  Okay.  I understand.

MR. DAVIS:  But the other issue is, because they've

made some limited arguments but not under oath and not any

representations from any of the witnesses that they may not be

able to get that data, so as an alternative, what our expert

has done is said, well, I can estimate that based on the

average number of data plans a user does, and he has an

approach to that.  And so barring -- if the Court wants to

maintain and not have them give discovery, then we would ask

permission for our expert to at least offer that opinion on his

estimation on what those foreign sales would be.  And again,

their own expert has said that you can look to foreign sales --

THE COURT:  Okay.  I heard you the first time.

Go ahead.

MR. BUSBY:  Just two points, your Honor.

If you buy a data package in London and it has any

form of data, if it's a global data package, therefore, a

portion of that could be in the United States, they have that

data.  Then they have the flow data of all data used.  So if

there's a portion of that package that is allowed, is a global

data package -- there's three types.  There's US data packages,

j4o1simc

North America data packages, and global data packages.  So
under my adversary's -- if you buy a package in London and it's
global and you can use that data in the United States, the
first real issue is, did the user, did Joe Smith actually use
all the data.  That's why they have the flow data that shows
all the data monthly that was used in the United States.
That's really what matters.  So they have any data that was
used in the United States.

Second point:  Their damages expert, Mr. Martinez, I
deposed him.  The second theory, it's not in his expert report.
And your Honor seems very clear you're going to hold us tightly
to our expert reports, which we appreciate.  What happened was,
at the end of his deposition, they took a break and he came
back and he said, well, I think I can estimate this, and he did
a calculation.  We have an MIL on that issue.  But that's not
in their expert report.  Mr. Martinez did not do that in his
expert report, so the second option isn't even available.

THE COURT:  Well, I think their argument is that since
I gave them the right to renew their discovery request on that
theory, that implicit in that, what good would the discovery
have been if their expert couldn't supplement his report in
that regard.  So I don't think that that is necessarily a dead
issue.

But this is very helpful.  I will get you a ruling by
tomorrow afternoon.

j4o1simc

1          MR. BUSBY:  Your Honor, can I just make one point.

2          THE COURT:  Yes.

3          MR. BUSBY:  They actually asked us -- I have the

4    emails right here -- if they could supplement their expert

5    report.  This is in March.  And we asked for clarification

6    whether they could tell us what they were going to do.  We

7    never heard anything after that.  So they actually asked us

8    whether they could supplement their damages expert report.  We

9    haven't seen that.  So that issue has come up with counsel.

10         THE COURT:  What about that?

11         MR. DAVIS:  We had mentioned doing that, and we've

12   told them orally about what we planned to do.  It's no big

13   secret here.  I mean, they heard it.  As my friend said, that

14   they've mentioned it during the deposition of what we were

15   going to do, and we're happy to, if the Court allows us to, to

16   provide that in advance of his testimony at trial.

17         THE COURT:  All right.  I really think I've heard what

18   I need to hear to make a ruling.  I will get you a ruling by

19   tomorrow afternoon on this issue.

20         Anything else?

21         MR. DAVIS:  One other issue relating to the damages

22   issue.

23         Just last night we received a supplemental

24   interrogatory response, and it updates the time period in which

25   one of the accused products was sold, and so it sold for longer

j4o1simc

1    than what they've represented to us.  We haven't gotten a

2    definitive answer whether or not we have the records for those

3    sales.  So a G2 device was sold for a year or six months, I

4    don't remember the exact time period, longer than what they

5    told us, and so it could be a nonissue in that they've given us

6    the records already and we have all the data, just there were

7    some clerical mistake in there or not, but we need that so we

8    can present it accurately when we put on our damages expert.

9         THE COURT:  Well, it's moot at this point, but it may

10   be a real live issue.  And so you know how to call in to the

11   Court.  After you've found out if it's a real issue and you

12   want to pursue it, jointly call the Court and we'll deal with

13   it.

14        Yes.

15        MR. BUSBY:  Your Honor, just another related issue.

16        We're wrestling with the PCO, and we noted in the

17   draft that there's Mr. Martinez, their damages expert, who I

18   deposed in January, and we haven't heard anything about a

19   supplemental report since then.  Their new number in the

20   pretrial consent order is over $2 million.  The number in his

21   expert report is $700,000, based on the Court's ruling of no

22   past judgment, past damages.  So it seems that not only have

23   they not supplemented the report, which they asked us about

24   this international data estimate issue, they also are

25   apparently coming in with new damages calculations, which are

j4o1simc

1     not in his expert report.

2              MR. DAVIS:  I'm just hearing this for the first time

3     so I'm not exactly sure what he's saying here, but I think the

4     issue might be that the data that we got was limited to

5     December 31st of last year and we requested some additional

6     data through trial time, and I think that's probably where the

7     numbers come from.

8              MR. BUSBY:  And your Honor, that's exactly -- excuse

9     me, your Honor, but that's exactly what the supplemental report

10    was.  They asked if they could supplement the report, and we

11    said:  On what?  How are you going to do it?  What's the

12    methodology?  There's no supplemental report.  It's just like

13    when we were stopped or blocked by the Court --

14             THE COURT:  Whoa, whoa, whoa.

15             Normally I hold experts very strictly to what's in

16    their report.  But if what happened -- I'm not clear that this

17    is what happened, but if defendant supplemented their

18    interrogatory responses very recently and said the date -- I'm

19    going to give a hypothetical -- instead of 2016, 2018, then of

20    course there would be a basis to supplement the report, at

21    least in the arithmetic sense, because of the change.

22             MR. BUSBY:  But your Honor, there are really distinct

23    issues here, and I'm very sorry.  What Mr. Davis is talking

24    about is device sales, the device, okay?  That number -- what

25    happened in the California case is we found out there was some,

J4OMSIMC2

1    you know, within months, different sales data.  Their expert,

2    he doesn't even rely on devices.  So that's one issue.  What I

3    was talking about the supplemental report is the data usage,

4    the data flow, all that stuff.  That's the real issue.  That's

5    what Mr. Martinez relies on.  And that's the data that we've

6    given them.  And they said, well, we want to give you a

7    supplemental report, and we asked for them, and we said, What's

8    your methodology?  I'm sorry.  They asked us -- I'm sorry.

9    They asked us.  They said, you know, can we give you a

10   supplemental report?  We said, How?  What are you doing?  When?

11   And we haven't received that for months.

12              (Continue on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

J4OMSIMC2

1              THE COURT:  If there was an increase from 700,000 to 2

2    million, it doesn't sound like it had anything to do with this

3    supplemental interrogatory.

4              MR. BUSBY:  Absolutely, your Honor.

5              THE COURT:  What did it have to do with?

6              MR. DAVIS:  They only provided us records that went

7    through December.  So there is additional records that show

8    additional sales devices throughout the trial and that is

9    arithmetically supplementing.  There is more information we

10   have.  There are infringements ongoing.

11             THE COURT:  The data you had originally was through

12   when?

13             MR. DAVIS:  Through the end of the year.  Through

14   December 2018.

15             THE COURT:  And now you have through a few months?

16             MR. DAVIS:  Yes.

17             THE COURT:  How could that possibly account for a

18   change from 700,000 to 2 million?

19             MR. DAVIS:  Because our patent only started in August,

20   and so from August to December there weren't very much sales.

21   It wasn't that long.  Only four months.  So an additional four

22   months and they have had a lot more sales.  I don't have the

23   exact numbers here in front of me because this is the first

24   time I saw an issue, so I can't really calculate it for you.

25             It's not that we are offering a new theory of damages.

27

J4OMSIMC2

1   All it would be is we are just adding in the additional

2   information in arithmetic savings.

3          THE COURT:  When did you get that additional

4   information?

5          MR. DAVIS:  To be honest, it's probably been a while

6   ago.

7          MR. BUSBY:  January.

8          MR. DAVIS:  I don't know if it's exactly January.  It

9   wasn't like it was a week or two ago.  It's been a while ago.

10          THE COURT:  That was the point in time to call the

11   Court and say, we want to supplement, unless they had agreed to

12   it.  But assuming they didn't agree to it, not on the eve of

13   trial.

14          Let me go back to defense counsel.  If it's purely

15   arithmetic and they blew it and they should have asked in

16   January, how would you be prejudiced if you were given, say, a

17   three-hour additional deposition of their witness?

18          MR. BUSBY:  Your Honor, I'm very sorry.  We are mixing

19   a lot of issues here.  It's not device sales that we trued up

20   from September at their request, from September to December.

21   It's data and they are the ones who said, can we supplement the

22   report and we said --

23          THE COURT:  Excuse me.  If the new calculation is

24   simply an arithmetic addition of stuff based on after-provided

25   discovery, that's one thing.  If it's something else, I agree

28

J4OMSIMC2

with you then it's apples and oranges.  But they are

representing, at least for now, that they got data from you

that supplemented the time period and the sales involved and

that that is the sole basis for the new calculation.

MR. DAVIS:  That's what I believe, your Honor.

THE COURT:  Assuming hypothetically that's right and

it was wrong, you have a different objection.  But assuming

it's hypothetically right, how would you be prejudiced if you

had another three-hour deposition with the expert?

MR. BUSBY:  To be honest, your Honor, I would hope

that within three hours we could find out what he did.  This is

a little bit complex.  Here is his original report and, as you

know, it's very detailed.

I really apologize.  But there are a lot of issues

going on here.  There is the international data issue.  I don't

know if that's involved.  Then there is the device issue and

there is, I think, this issue.  We really don't know what

happened.  It may take a lot of time to undo this ball of

twine.

THE COURT:  Here is what I'll do for now because I

have to go teach and need to leave now.

I think the initial burden is on the plaintiff because

they, on their own statement, had what they needed back in

January and did not move to supplement the report at that time.

Plaintiff should put in a letter brief not to exceed

J4OMSIMC2

1    five single-spaced pages explaining why nevertheless they

2    should be able to, in effect, supplement, and you know some of

3    the arguments from the other side, so you can anticipate that

4    in your initial letter and that letter should be submitted to

5    the Court by no later than noon tomorrow.

6         Defense counsel can then put in a response, similar,

7    five-page, single-spaced letter by no later than 9 a.m. on

8    Friday.  Plaintiff's counsel can then put in a reply limited to

9    two pages, single spaced, by no later than 5 p.m. on Friday.

10        I'm taking a plane to São Paulo, Brazil at 11:00

11   Friday.  I will get you a ruling before I leave.

12        MR. BUSBY:  Your Honor, just for clarification, this

13   relates to that $2 million calculation, correct?

14        THE COURT:  Correct.  Real good.  Thanks very much.

15        (Adjourned)

16

17

18

19

20

21

22

23

24

25