UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIMO HOLDINGS INC., | |
| Plaintiff, | 18-cv-5427 (JSR) |
| -against- | OPINION AND ORDER |
| HONG KONG UCLOUDLINK NETWORK TECHNOLOGY LIMITED and UCLOUDLINK (AMERICA), LTD., | |
| Defendants. | |



JED S. RAKOFF, U.S.D.J.

Following a trial in this patent infringement case, the jury found in favor of plaintiff SIMO Holdings Inc. ("SIMO") and awarded damages against defendants Hong Kong uCloudlink Network Technology Limited and its American subsidiary, uCloudlink (America), Ltd. (collectively, "uCloudlink"). Now before the Court are the parties' various post-trial motions.

The facts and procedural history of this case are set out in more detail in the Court's Opinion explaining its summary judgment rulings, familiarity with which is here presumed. See Summary Judgment Opinion, ECF No. 163. In brief, uCloudlink sells a line of mobile WiFi hotspot devices, the GlocalMe G2, G3, and U2, as well as an S1 mobile world phone (collectively, "the Infringing Devices"). These products all permit users to access data services while traveling abroad without incurring the roaming fees charged

1

by telecommunications providers. SIMO filed suit, alleging that these products violated several claims of SIMO's U.S. Patent No. 9,736,689 ("the '689 Patent").[1] The Court granted SIMO summary judgment of infringement as to claims 8 and 11, see Summary Judgment Opinion 42, and the parties stipulated for the purposes of trial that the Devices also infringed the remaining asserted claims, see Stipulation ¶ 6, ECF No. 165. The jury was therefore asked to determine: whether the asserted claims were invalid because they were anticipated by prior art; whether the infringement was willful; and the extent of damages. The jury found that at least one of the asserted claims was not invalid and that the infringement was willful, and awarded compensatory damages of $2,183,562.40. See Jury Verdict, ECF No. 180. The Court subsequently granted plaintiff's motion to enhance the damages by 30% based upon the finding of willfulness. See Memorandum Order dated June 3, 2019 ("Enhanced Damages Order"), ECF No. 204.

Defendants now renew their motions for judgment as a matter of law on several grounds and seek a new trial on several others. For the reasons given below, those motions are denied. Plaintiff moves to supplement damages based on data not presented to the jury; seeks a permanent injunction; and seeks an award of

---

[1] SIMO also originally asserted infringement of certain claims of Patent No. 8,116,735, the predecessor to the '689 Patent, but those claims were dropped prior to summary judgment.

2

attorney's fees. Plaintiff's motions to supplement damages and for a permanent injunction are granted. Plaintiff's motion for attorney's fees is denied.

## I. Defendants' Motions

### A. Motion for Judgment as a Matter of Law

uCloudlink moves, pursuant to Fed. R. Civ. P. 50(b), for judgment as a matter of law on several issues. The Federal Circuit reviews such motions "under regional circuit law." Wordtech Systems, Inc. v. Integrated Network Solutions, Inc., 609 F.3d 1308, 1312 (Fed. Cir. 2010). In the Second Circuit, "[a] Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Matusick v. Erie County Water Auth., 757 F.3d 31, 52 (2d Cir. 2014) (quoting Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005)). The evidence must be taken in the light most favorable to the non-moving party. Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir. 2001). "A movant's burden in securing Rule 50 relief is particularly heavy after the jury has deliberated in the case and actually returned its verdict." Cross, 417 F.3d at 248. Only "a complete absence of evidence" will justify granting the motion under such circumstances. Id. (quoting Song v. Ives Labs, Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)).

3

## 1. Willfulness

uCloudlink contends that there is insufficient evidence to support the jury's verdict of willful infringement. The Court previously awarded SIMO enhanced damages of 30% based on this finding, but explicitly reserved the question of whether there was sufficient evidence to support it. See Enhanced Damages Order 3 n.3. With the issue now squarely presented, the Court concludes that the jury's finding of willfulness was supported by sufficient evidence.[2]

uCloudlink argues that SIMO adduced no evidence that uCloudlink knew of the '689 Patent prior to August 13, 2018, so any infringement prior to that date could not have been willful. Def. Mem. Supp. Mot. JML 3-4, ECF No. 221. "Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages." WBIP, LLC v. Kohler Co., 829 F.3d 1317, 1341 (Fed. Cir. 2016). Contrary to uCloudlink's claim, however, the

---

[2] uCloudlink suggests that the Court improperly deferred to the jury on the question of willfulness. Def. Reply Mem. Supp. Mot. JML 5, ECF No. 254. That is not so. Federal Circuit precedent dictates that the willfulness of infringement is a jury question. See WBIP, LLC v. Kohler Co., 829 F.3d 1317, 1341 & n.13 (Fed. Cir. 2016) ("We do not interpret Halo as changing the established law that the factual components of the willfulness question should be resolved by the jury."). Of course, the Court retains discretion not to enhance damages even upon a finding of willfulness, and the Court acknowledged as much in its order granting increased damages. See Halo Elec., Inc. v. Pulse Elec., Inc., 136 S. Ct. 1923, 1933-34 (2016) ("[N]one of this is to say that enhanced damages must follow a finding of egregious misconduct."); 35 U.S.C. § 284 (district court "may" increase damages).

4

Court concludes that there was circumstantial evidence that, while not overwhelming, was sufficient for the jury to reasonably infer that uCloudlink had knowledge of the '689 Patent earlier than August of 2018. First, there was testimony suggesting that a uCloudlink employee was at least familiar with the '735 Patent as of 2016. The '735 Patent is the parent to the '689 Patent, and the application that would become the '689 Patent was pending as of 2016.[3] Second, uCloudlink's internal architecture documents bear notable similarities to both the '689 Patent and to SIMO's internal architecture documents. Third, Wang Bin was hired from Skyroam by uCloudlink in 2013, and he concededly took several confidential Skyroam files with him (although it is disputed whether uCloudlink knew of or made use of those files).

To be sure, none of this is direct evidence that uCloudlink knew of the '689 Patent. But it is evidence from which a jury could reasonably infer that uCloudlink had such knowledge. "Evidence of pre-suit knowledge of a patent can be circumstantial." Kaneka Corp. v. SKC Kolon PI, Inc., 198 F. Supp. 3d 1089, 1107 (C.D. Cal. 2016). uCloudlink's arguments to the contrary largely rest on unpersuasive interpretations of law. For example, uCloudlink

---

[3] uCloudlink suggests that this testimony – by its own corporate representative, Rongrong Zeng – was not reliable, see Def. Mem. Supp. Mot. JML 6, but that determination was for the jury, not this Court. In any event, Zeng unequivocally testified that uCloudlink was aware of the '735 Patent by 2016; his only uncertainty was about whether a specific person reviewed the patent. See Restauri Decl. Exh. 2, ECF No. 220-2.

5

argues that a finding of willfulness cannot be based on conduct prior to, at the earliest, August 15, 2017, when the '689 Patent issued. Def. Mem. Supp. Mot. JML 4. But the Federal Circuit has seriously called that argument into doubt, albeit in an unpublished opinion. See WCM Indus., Inc. v. IPS Corp., 721 F. App'x 959, 970 n.4 (Fed. Cir. 2018) (observing that patent applications are now published, such that possible infringers can discover what claims a patent will likely cover, but not deciding whether prior precedent holding that such applications were irrelevant should be overruled); see also id. at 970 ("[H]ere WCM provided sufficient evidence for a reasonable jury to conclude that IPS did know of WCM's patents as they issued, if not earlier.") (second emphasis added). Because the willfulness determination "looks to the totality of the circumstances presented in the case," id., it would be artificial to ignore the reasonable possibility that uCloudlink might have learned of the application that would become the '689 Patent.

Additionally, the Court notes that uCloudlink did not introduce any evidence establishing when it learned of the '689 Patent. While uCloudlink was, of course, not obligated to do so, as the burden to prove knowledge and willfulness was plaintiff's, the absence of countervailing evidence is relevant to the determination of whether the jury's verdict was permissible. The jury's inference of knowledge arguably might not have been

6

reasonable had uCloudlink adduced evidence establishing when, in fact, it learned of the patent. But without such evidence, the jury was not forbidden from concluding, based on all of the circumstances, that uCloudlink in fact did know of the '689 Patent, at or before the time of its issuance.

Similarly, uCloudlink argues that its knowledge of the '735 Patent cannot support an inference that it knew of the '689 Patent. uCloudlink principally relies on Vasudevan Software, Inc. v. TIBCO Software Inc., which concluded that "[t]he requisite knowledge of the patent allegedly infringed simply cannot be inferred from mere knowledge of other patents, even if somewhat similar." No. C 11-06638 RS, 2012 WL 1831543, at *3 (N.D. Cal. May 18, 2012). As a decision from a court of coordinate jurisdiction, Vasudevan is not binding on this Court. Moreover, Vasudevan predates the Supreme Court's decision in Halo Elec., Inc. v. Pulse Elec., Inc., which "eschew[ed] any rigid formula" for determining willfulness. 136 S. Ct. 1923, 1934 (2016). In that vein, the Court agrees with the court in Dentsply Sirona, Inc. v. Edge Endo, LLC, Civ. No. 17-1041 WJ/SCY, 2019 WL 1517584, at *4 (D.N.M. Apr. 8, 2019), that subsequent cases, "which were decided with the benefit of Halo's guidance, are more persuasive than Vasudevan." See also SiOnyx, LLC v. Hamamatsu Photonics K.K., 330 F. Supp. 3d 574, 610 (D. Mass. 2018) (concluding that "there is no bright-line rule as to what level of knowledge is sufficient" for willfulness and that

7

knowledge of patent application could support finding of willfulness). In any event, "[h]ere, the patents are not simply 'somewhat similar,' but in fact describe the same method and apparatus." Kaneka Corp., 198 F. Supp. 3d at 1108.

As for Wang Bin, uCloudlink contends that "SIMO produced no evidence that any of the bad acts allegedly undertaken by Mr. Bin were done with the knowledge or direction, or even for the benefit, of uCloudlink." Def. Reply Mem. Supp. Mot. JML 3. Not so. At his deposition, portions of which were played at trial, Wang Bin invoked his Fifth Amendment privilege in response to several questions, including the following:

> When you copied Skyroam documents to your uCloudlink computer, you did so in order to aid uCloudlink in competing with Skyroam; correct?
>
> When you copied Skyroam's trade secrets to your uCloudlink work computer, did you intend to use those documents to benefit uCloudlink and to create patents for uCloudlink?
>
> Did you use the Skyroam trade secrets that you copied to your uCloudlink work computer to create patents for uCloudlink?
>
> Isn't it true that after you copied this Skyroam document onto your uCloudlink work computer, you used this document to benefit uCoudlink and to – to the detriment of Skyroam?

Soskin Decl. Exh. 2, at 158:13-158:21, 158:23-159:7, 159:19-160:2; 191:16-191:2, ECF No. 183-2. As the Court instructed the jury, see

8

Tr. 227,[4] it was permitted – though not required – to draw an adverse inference from these refusals to answer. The jury was also instructed that it was not to hold Wang Bin's refusal to answer against uCloudlink unless it concluded that, "at the time of the underlying offense," he was "sufficiently associated" with uCloudlink. Tr. 512. Thus, the jury could have permissibly inferred that Wang Bin intended to, and in fact did, use Skyroam's confidential information to benefit uCloudlink. uCloudlink relies on Wang Bin's denial that he shared the documents with anyone else at uCloudlink, see Def. Reply Mem. Supp. Mot. JML 3-4, but the jury was certainly not required to credit this testimony.

The Court concludes that there is more than "a complete absence of evidence," Cross, 417 F.3d at 248, supporting the jury's verdict of willfulness.[5] uCloudlink's motion for judgment as a matter of law on willfulness is therefore denied.

2. Damages

uCloudlink raises several arguments against the viability of SIMO's damages theory. The Court is not persuaded by any.

---

[4] Citations to "Tr." refer to the trial transcript.

[5] The Court agrees with uCloudlink that its litigation conduct would not, in itself, be sufficient to support a finding of willfulness. Contrary to SIMO's contention, see Pl. Mem. Opp. Mot. JML 8-9, ECF No. 244, the Court does not find defendants' litigation positions to be so meritless as to support an inference of bad faith. Because the Court finds other evidence sufficient to support a finding of willfulness, however, it is of little consequence.

9

First, uCloudlink argues that SIMO improperly sought to recover damages for lost profits, which it may not do since the patent-practicing products were sold by Skyroam, SIMO's wholly-owned subsidiary, rather than by SIMO directly.. Def. Mem. Supp. JML 8-9. uCloudlink is correct that the lost profits of a subsidiary are not recoverable by the parent corporation, except upon a showing that the subsidiary's profits "flow inexorably up to the parent." Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1367 (Fed. Cir. 2008), mandate recalled and amended, 557 F.3d 1377. But that rule does not govern this case for the simple reason that SIMO did not proceed on a lost profits theory. It sought to recover a reasonable royalty.

uCloudlink protests that although SIMO said it was pursuing a reasonable royalty, in effect it sought to recover lost profits. The Court has rejected this argument twice already – first in ruling on defendants' motions in limine and again when defendants first moved for judgment as a matter of law – and now does so again.

Defendants have not explained why considering Skyroam's profit margin is categorically impermissible in a reasonable royalty analysis. The goal of such an analysis is to reconstruct what the parties would have agreed to in a hypothetical negotiation. In the but-for world in which SIMO and uCloudlink had negotiated a royalty rate, is there any doubt that SIMO, as part

10

of that negotiation, would have considered the profit margins of its wholly-owned subsidiary? It seems unreasonable to suggest otherwise. The Court is not persuaded that taking Skyroam's profit margins into account was impermissible, nor that doing so automatically made the damages theory one of "lost profits" instead of reasonable royalty. See Callaway Golf Co. v. Acushnet Co., 691 F. Supp. 2d 566, 575 (D. Del. 2010) ("[A]t least in the context of a reasonable royalty analysis, the Federal Circuit has expressly allowed damages for subsidiaries' sales."). Indeed, in considering the opposite scenario, a suit by a subsidiary, the Federal Circuit has expressly approved including the impact on a related company in the reasonable royalty analysis. See Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366, 1378 (Fed. Cir. 2005), overruled on other grounds by Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 576 F.3d 1348 (Fed. Cir. 2009) ("[T]he holding company would not enter any negotiation without considering the competitive position of its corporate parent . . . . [A]ny hypothetical negotiation with the holding company must necessarily include the reality that the economic impact on the [parent company] would weigh heavily in all decisions.").

The Court also rejects uCloudlink's assertion that SIMO's expert, Christopher Martinez, simply plugged in Skyroam's lost profits and called it a day. uCloudlink's basis for this theory is that the royalty rate advanced by plaintiff's expert - $3.00 per

11

Daypass sold – is almost identical to Skyroam's profit margin per Daypass. But that is simply a misunderstanding of the evidence. Skyroam's profit per Daypass was $3.00 at the wholesale price, and closer to $7.00 per Daypass at the retail price. See Tr. 294–95. Contrary to uCloudlink's argument, then, it does not appear that SIMO is simply smuggling in lost profits under the guise of a reasonable royalty; if it were, the number would be higher.

Nor was there anything improper about the calculation advanced by Martinez. He testified that Skyroam buys 500 megabytes of data from a carrier for about $2.00, then sells a Daypass to package those 500 megabytes to a retailer for about $5.00. Tr. 293. This, according to Martinez, represented the "value" that Skyroam had added through the use of its patented system. This is, to be sure, a somewhat crude calculation, but defendants have not explained why it is not a reasonable proxy for determining the value added by Skyroam.

Defendants also criticize Martinez for characterizing the relationship between Skyroam and uCloudlink as "zero-sum," because other competitors offer mobile roaming services. Def. Mem. Supp. JML 10. As an initial matter, this argument only matters if plaintiff recovered damages for lost profits, and, as the Court has already explained, that is not the case. In any event, the evidence before the jury permitted a finding that Skyroam and uCloudlink were the only major companies competing for their

12

specific pool of customers, because testimony distinguished other putative competitors' services. Carriers like AT&T, for example, offer roaming services, but it was characterized by Skyroam's president, Eric Plan, as "very expensive" and not comparable to Skyroam's own offering. Tr. 163. Similarly, manufacturers of stand-alone mobile hotspots do not typically sell data services, requiring consumers to purchase those separately. Tr. 163. Thus, Plam characterized uCloudlink as Skyroam's "main competitor," as one of the only companies to supply both "the data and the hardware." Tr. 164. Martinez similarly testified that "for a consumer that wants this sort of solution" – i.e. both data and hardware in one package – "as opposed to a consumer that might want to just take their phone and roam," Skyroam and uCloudlink "are the two major competitors in this space." Tr. 305.

Finally, uCloudlink complains that Martinez erred by calculating the reasonable royalty rate based on the number of data packages sold. Def. Mem. Supp. Mot. JML 12. Defendants argue that Martinez ought to have included the Infringing Devices themselves in the royalty base. This is a curious argument, because defendants' own damages expert (whose opinion as to a reasonable royalty was ultimately excluded from trial by the Court, for unrelated reasons) also calculated the reasonable royalty as a function of the number of Daypasses sold. See Hansen Rep. ¶ 12, Soskin Decl. Exh. 1, ECF No. 154-1. And this makes good sense, for

13

as Martinez testified (in a point not seriously challenged by defendants), Skyroam profits from the sale of data to be accessed with its devices, not from the sale of the hardware itself. Tr. 283, 292. It is therefore eminently reasonable to suggest that a hypothetical negotiation might have produced a per-Daypass royalty rate, rather than one keyed off of device sales.

Defendants argue that this Daypass-based royalty rate failed to limit damages to the infringing features, because the Daypasses themselves are not infringing. Def. Mem. Supp. Mot. JML 13-16. The Court is not persuaded. "When the accused infringing products have both patented and unpatented features," the jury must determine "the value added by such features." Ericsson, Inc. v. D-Link Systems, Inc., 773 F.3d 1201, 1226 (Fed. Cir. 2014). "Logically, an economist could do this in various ways – by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." Id.

Here, as discussed above, the value of uCloudlink's devices is not in the hardware itself. Rather, it is the fact that the products permit convenient global mobile network access. The devices themselves are useful only insofar as they serve as "gateways" to the data or mobile network. And, crucially, the manner in which the uCloudlink devices provide roaming services

14

infringed SIMO's '689 Patent. Thus, by limiting the reasonable royalty rate to the sales of Daypasses, Martinez adequately focused on the value added by the '689 Patent – i.e. the ability to provision mobile roaming services. To suggest that the reasonable royalty should be based only on the Infringing Devices, rather on the data access that the infringement makes possible, is simply to ignore economic reality. Contrary to defendants' arguments, Martinez was not obligated to "subtract[]' any unpatented elements." Def. Mem. Supp. Mot. JML 15.[6] That is only one permissible way to apportion damages. See Ericsson, Inc., 773 F.3d at 1226 (economist can apportion by "careful selection of the royalty base" or by "adjustment of the royalty rate").

Nor is the Court persuaded that Martinez's failure to discount for non-infringing alternatives is fatal to his analysis. Martinez relied on the opinion of plaintiff's technical expert, Dr. Paul Clark, who opined in his report that no acceptable non-infringing alternatives exist. Tr. 339–40; Clark Rep. ¶ 710, Cangro Decl.

---

[6] The "unpatented elements" highlighted by defendants include "the semiconductor chip, the antennas, the processor, memory components, the touch screen, batteries, [and] the external casing." Def. Mem. Supp. Mot. JML 15. This only reinforces how central the infringing features were. If defendants sold their devices with all of those unpatented features, but without the infringing capability to provision data services, scarcely anyone would buy them. They would lack the central feature that consumers are looking for in such products. Cf. Apple Inc. v. Samsung Elec. Co., 735 F.3d 1352, 1364 (Fed. Cir. 2013) ("[A] battery does not necessarily drive demand for a laptop computer simply because its removal would render the laptop ineffective as a portable computer. That is because consumers often do not choose a laptop based on its battery . . . .") (citation omitted).

15

Exh. A, ECF No. 89-1. Although defendants' expert disagreed, neither Martinez nor the jury was required to credit his analysis over Clark's. Judgment as a matter of law is not an appropriate vehicle for a judge to pick sides in a battle of otherwise qualified experts.

To be sure, the jury was not required to accept the calculations offered by Martinez. Defendants offered reasonable arguments for why the reasonable royalty rate should have been lower. But the jury evidently rejected those arguments, as it was permitted to do. The Court cannot say that there was not substantial evidence supporting the jury's damages calculation.

### 3. Patent Invalidity

uCloudlink argues that any reasonable jury would have concluded that the '689 Patent is invalid because it was anticipated by the Andreini reference or the Patarkazishvili reference. Def. Mem. Supp. Mot. JML 21. The Court disagrees. A claim is anticipated only "if each and every limitation is found either expressly or inherently in a single prior art reference." King Pharmaceuticals, Inc. v. Eon Labs, Inc., 616 F.3d 1267, 1274 (Fed. Cir. 2010) (quoting Celeritas Techs. Ltd. v. Rockwell Int'l Corp., 150 F.3d 1354, 1360 (Fed. Cir. 1998)). Here, the jury could reasonably have concluded that both references lacked at least one limitation of the '689 Patent.

16

First, as to Andreini, claim 8 of the '689 Patent requires a "wireless communication client" that includes programs capable of "enabling an initial setting of the wireless communication client . . . and a remote administration system." '689 Patent at 25:4–13. Defendants argue that this limitation is met by Andreini, which describes the remote administration system sending parameters to peripheral devices. But even assuming that this constitutes "enabling an initial setting" on the peripheral devices – something SIMO vigorously disputes – it would not be sufficient, because the wireless client does not enable anything. Rather, in Andreini, even in defendants' telling, the remote administration system enables an initial setting on both the wireless client and the remote administration system. What claim 8 requires is that the wireless client enable those settings. Defendants have not shown that the Andreini wireless client enables any kind of setting of the remote administration system.

Moreover, Clark testified that the wireless devices in Andreini do not qualify as "foreign wireless clients" because they are subscribed to the local network. Tr. 593. Defendants contest this, but they cite to no evidence in support of their contrary contention; at no point did defendants' expert, Dr. Martin Feuerstein, ever testify that the Andreini wireless devices are not subscribed to a local cellular network. The jury did not act unreasonably in crediting Clark's testimony on this point.

17

Accordingly, the jury could reasonably have concluded that Andreini lacked at least two limitations of the '689 Patent.

The jury could also have reasonably concluded that the Patarkazishvili reference does not include the "foreign wireless client" limitation. Feuerstein agreed that the wireless client in Patarkazishvili is "always connected to its home network" and that the SIM card is not described within the reference as being foreign (i.e. not subscribed to the local network). Tr. 499. Defendants claim that the wireless communication client in Patarkazishvili "does not include a SIM card." Def. Mem. Supp. Mot. JML 25. That claim is contradicted by Feuerstein's testimony; he readily agreed that the SIM card is "part of [] the wireless communication client." Tr. 499. Clark concluded that the client was not "foreign" because it is subscribed to the local network, Tr. 599, and the jury could reasonably have agreed.

Additionally, Feuerstein claimed that in Patarkazishvili, the "remote administration system" is the "client computer." Tr. 404. In other words, for Feuerstein, the "remote" administration system is in fact the computer that the user is sitting in front of. That is an unconventional use of the word "remote," to say the least. The jury could reasonably have adopted Clark's contrary view that Patarkazishvili does not include a "remote" administration system at all. Tr. 599.

18

The jury could reasonably have concluded that both Andreini and Patarkazishvili each lacked at least one limitation of the '689 Patent. uCloudlink is thus not entitled to judgment as a matter of law on the issue of invalidity - an issue on which it bore the burden of proof by clear and convincing evidence. See Microsoft Corp. v. i4i Ltd. Partnership, 564 U.S. 91, 95 (2011).[7]

For the foregoing reasons, uCloudlink's motion for judgment as a matter of law is denied in all respects.[8]

B. Motion for New Trial

uCloudlink moves, pursuant to Fed. R. Civ. P. 59, for a new trial on several issues. See Def. Mem. Supp. Mot. New Trial, ECF No. 224. A district court may grant a new trial under Rule 59 where

---

[7] uCloudlink also argues that SIMO failed to adduce sufficient evidence that the '689 Patent's invention date was earlier than the effective filing date of February 28, 2008. Def. Mem. Supp. Mot. JML 18. The invention date is relevant only because it affects whether Patarkazishvili can possibly qualify as prior art. Because the Court concludes that substantial evidence supports a determination that Patarkazishvili does not anticipate the '689 Patent, regardless of which was first in time, there is no need to address defendants' arguments regarding sufficiency of the evidence about the date of invention. See Advance Pharma., Inc. v. United States, 391 F.3d 377, 391 (2d Cir. 2004) (where jury finding may be premised on one of two theories, "[i]f the evidence was sufficient to support either reason, there cannot be a complete absence of evidence supporting the verdict" so as to require the judgment to be set aside) (internal quotation marks omitted) (quoting Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998)).

[8] uCloudlink also summarily renews its claim construction arguments solely for the purpose of preservation, although it acknowledges that it is not necessary to renew those arguments in order to preserve them for appeal. Def. Mem. Supp. JML 17-18 & n.6. The Court declines to revisit its claim construction rulings.

19

the "court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks and alteration omitted) (quoting Munafo v. Metropolitan Transp. Auth., 381 F.3d 99, 105 (2d Cir. 2004)). "[A] high degree of deference is accorded to the jury's evaluation of witness credibility," and so "jury verdicts should be disturbed with great infrequency." ING Global v. United Parcel Service Oasis Supply Corp., 757 F.3d 92, 99 (2d Cir. 2014). As discussed further below, the Court is not persuaded that any of the putative errors assigned by uCloudlink resulted in serious error or a miscarriage of justice. The motion for a new trial is therefore denied.[9]

## 1. Admission of Wang Bin's Testimony

uCloudlink contends that it was seriously prejudiced by "the admission of evidence related [to] the personal misconduct of Wang Bin." Def. Mem. Supp. Mot. New trial 3. uCloudlink argues that Wang Bin's misconduct in 2013 could not be relevant to the issue

---

[9] uCloudlink renews its arguments for judgment as a matter of law, seeking, in the alternative, a new trial pursuant to Fed. R. Civ. P. 59 on each ground for which it seeks judgment as a matter of law. See Def. Mem. Supp. Mot. New Trial 2-3. That motion is denied. Although Rule 59 motions are governed by a more lenient standard, under which the Court may independently weigh the evidence, the Court is of the view that the jury reasonably resolved all factual issues now disputed by uCloudlink, and the verdict was not "seriously erroneous," "a miscarriage of justice," or "against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (quoting DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998)).

20

of willfulness – the only issue for which the testimony was admissible – because the '689 Patent had not yet issued. That is a spurious argument. To be sure, willfulness is measured by the "knowledge of the actor at the time of the challenged conduct." Halo, 136 S. Ct. at 1933. But that does not mean, as uCloudlink would have it, that the jury must shut its eyes to all events that predate the issuance of the patent. "[W]hether an act is 'willful' is by definition a question of the actor's intent, the answer to which must be inferred from all the circumstances." Gustafson, Inc. v. Intersystems Indus. Products, Inc., 897 F.2d 508, 510-11 (Fed. Cir. 1990) (emphasis omitted). Evidence of a pre-existing relationship between the parties could supply evidence of motive, knowledge, or intent, and so permit the jury to draw the inference that the infringing party did so intentionally. Cf. Fed. R. Evid. 404(b)(2).

Here, Wang Bin was hired by uCloudlink after he had worked at Skyroam for a short time, and he copied confidential Skyroam files – some related to the same technology described by the '689 Patent – to his uCloudlink work computer. See Wang Bin Deposition Clip Report 129:16-131:24, ECF No. 183-2. Jing Liu, SIMO's CEO, testified that Wang Bin was hired as a "chief architect" and that he "h[eld] a lot of the confidential information of how [Skyroam's] product worked," as well as a "product roadmap for the future, all the business ideas." Tr. 108-09. All of this was relevant to the

21

jury's evaluation of uCloudlink's "knowledge" about SIMO's technology and development as of "the time of the challenged conduct," Halo, 136 S. Ct. at 1933. From the fact that uCloudlink hired Skyroam's "chief architect," the jury could infer – though it was not required to – that uCloudlink was closely watching Skyroam's technology. Moreover, the jury could conclude that, even if uCloudlink had no part in the original theft, it was aware of, and willing to make use of, the stolen files. Finally, the jury could conclude that, based on its knowledge of SIMO's technology and product development, uCloudlink was aware that the Infringing Devices infringed SIMO's patent.[10]

The Court therefore adheres to its prior determination that Wang Bin's testimony was plainly relevant. Moreover, the Court is satisfied that the instructions to the jury mitigated any risk of unfair prejudice.[11]

---

[10] The Court is aware that uCloudlink denies having any knowledge of the files in Wang Bin's possession until they were discovered during this litigation. However, uCloudlink has presented no evidence substantiating that assertion – except of course Wang Bin's testimony, which, for a variety of reasons, might not have been credited by the jury.

[11] The Court rejects defendants' argument that Wang Bin's status as a Chinese national rendered the jury more predisposed to believe him guilty of theft of trade secrets. Def. Reply Mem. Supp. Mot. New Trial 1-2, ECF No. 255. First, there is no evidence that anti-Chinese bias influenced the jury. Second, both parties are Chinese companies, so it is not clear why any alleged anti-Chinese bias would harm defendants in particular. Finally, even assuming, arguendo, that the jurors were predisposed to view a Chinese witness with suspicion, it is undisputed that Wang Bin committed serious misconduct; the only question is whether that misconduct should be attributed to his employer. Moreover, uCloudlink's assertion that, by invoking the Fifth Amendment, "the jury understood that Mr. Bin was claiming protections to which he was not entitled," id.

22

## 2. The Court's Willfulness Instruction

uCloudlink next contends that the Court's instruction to the jury regarding "willfulness" was erroneous. Def. Mem. Supp. Mot. New Trial 6. "A party seeking to set aside a judgment based on erroneous jury instructions must establish," among other things, that "th[e] instructions were legally erroneous'," "the errors had prejudicial effect," and the party "requested alternative instructions that would have remedied the error." Seachange Intern., Inc. v. C-COR, Inc., 413 F.3d 1361, 1381 (Fed. Cir. 2005).

The Court instructed the jury that, "[t]o prove willful infringement, plaintiff must prove by a preponderance of the evidence that uCloudlink actually knew it was infringing at least one Asserted Claim of SIMO's '689 Patent, that is, that uCloudlink actually knew of SIMO's Patent and intentionally chose to infringe it." Jury Instructions 20, ECF No. 184. The Court declined, however, to instruct the jury (as uCloudlink had requested) that the jury could "consider whether uCloudlink's behavior was malicious, wanton, deliberate, consciously wrongful, flagrant, or in bad faith." uCloudlink contends that this omission was prejudicial.

---

at 2, is meritless. There was never any suggestion by any party at trial that Wang Bin was not entitled to the full protections of the Fifth Amendment in connection with his testimony in this proceeding, and the Court explicitly instructed the jury that he was so protected. Tr. 227.

The Court is not persuaded. uCloudlink has plucked this list of descriptors from the Supreme Court's opinion in Halo, 136 S. Ct. at 1932. Crucially, however, uCloudlink's proposed instruction omits the word "deliberate." See id. ("The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate."). So the Supreme Court made clear that "deliberate" – that is, intentional – infringement can be "willful."[12] The Court is satisfied that its instructions to the jury conveyed this legal principle, as the jury was told that it needed to conclude that uCloudlink knew it was infringing and intentionally chose to infringe.

uCloudlink does not explain how the jury was misled by the Court's instruction. The Court declined to adopt uCloudlink's proposed language because the list of descriptors – many of them not really applicable to this case – would have confused the jury and required additional supplemental explanation. See Tr. 575. If all that is meant by "wanton" is "deliberate" – and that is the

---

[12] Other parts of the Halo opinion echo that understanding. See, e.g., id. at 1929 (enhanced damages not appropriate "where the defendant appeared in truth to be ignorant of the existence of the patent right, and did not intend any infringement") (internal quotation marks omitted and emphasis added) (quoting Hogg v. Emerson, 11 How. 587, 607, 13 L. Ed. 824 (1850)); id. ("Courts of Appeals likewise characterized enhanced damages as justified where the infringer acted deliberately or willfully . . . .").

24

lesson the Court takes from Halo – the Court does not see the use in defining the word "wanton" for the jury. Moreover, because the descriptors are listed in the disjunctive, the jury could still have returned a verdict of willfulness upon finding that defendants' conduct was deliberate or intentional. There is no reason to think that adding several near-synonyms would have changed that result.

Finally, uCloudlink has not demonstrated any arguable prejudice. uCloudlink argues that "the jury did not understand that findings of willful infringement 'are generally reserved for egregious cases of culpable behavior.'" Def. Mem. Supp. Mot. New Trial 7 (quoting Halo, 136 S. Ct. at 1932). But defendants' own submission also did not include this language about "egregious cases," so the proposed instruction would not have informed the jury of this supposed principle. "When the error in a jury instruction could not have changed the result, the erroneous instruction is harmless." Seachange, 413 F.3d at 1381 (internal quotation marks and alteration omitted) (quoting NTP, Inc. v. Research in Motion, Ltd., 392 F.3d 1336, 1365 (Fed. Cir. 2004)).

More pertinently, uCloudlink misrepresents the law. The quoted language from Halo refers not to a jury's finding of willfulness, but rather to the court's decision whether to award enhanced damages. 136 S. Ct. at 1932; see also Presidio Components, Inc. v. American Technical Ceramics Corp., 875 F.3d 1369, 1382

25

(Fed. Cir. 2017) ("Discretion remains with the court to determine whether the conduct is sufficiently egregious to warrant enhanced damages."). The Court cannot be faulted for not instructing the jury about a legal standard not applicable to the question it was to decide. Further still, the Halo decision made clear that the "most culpable offenders" are those who "intentionally infringe[] another's patent – with no doubts about its validity or any notion of a defense – for no purpose other than to steal the patentee's business." 136 S. Ct. at 1932. So, contrary to uCloudlink's position, "most culpable" is not an additional requirement before an intentional infringer may be described as willful; it is another way of describing intentional and deliberate infringers.

Accordingly, the Court finds neither error nor prejudice in the willfulness instruction.

### 3. The Verdict Form

Next, uCloudlink contends that the verdict form, see ECF No. 180, was prejudicial because it simply asked the jury to assess whether any of the infringed claims were valid, rather than breaking down the question claim-by-claim and prior art reference-by-prior art reference. Def. Mem. Supp. Mot. New Trial 8. This argument is meritless. Parties are not entitled to special verdicts on each discrete issue of fact, and it is within the trial court's discretion to require only a general verdict. See Fed. R. Civ. P. 49. Contrary to uCloudlink's argument that the verdict form

26

"prevents meaningful review of the jury's decision," Def. Mem. Supp. Mot. New Trial 8, courts regularly review whether there is adequate evidence to support a general verdict or a verdict with only a limited number of specific questions – as indeed the Court has done here.

Nor is there any merit to uCloudlink's argument that, by failing to include a separate jury question regarding the priority date of the '689 Patent, the verdict form shifted the burden of proof. Def. Mem. Supp. Mot. New Trial 8-9. First, the verdict form did not address burden of proof one way or the other. Second, defendants are not entitled to have matters already addressed in the jury instructions repeated in the verdict form.[13]

Finally, the Court does not detect any even arguable prejudice from the verdict form. uCloudlink's motion for a new trial on this ground is therefore denied.

### 4. The Admission of Martinez's Testimony

---

[13] If uCloudlink means to object to the fact that the Court did not expressly instruct the jury that SIMO bore the burden of proving entitlement to an earlier priority date, that contention is both untimely and unpersuasive. First, uCloudlink did not object to the Court's instruction regarding date of invention and so forfeited any challenge to the absence of a burden-of-proof component of that instruction. See Fed. R. Civ. P. 51(c)(2)(A). Second, "the party asserting invalidity[] must still show by clear and convincing evidence that the asserted patent is invalid," and it is only once "that burden is met [that] the party relying on validity is then obligated to come forward with evidence to the contrary." PowerOasis, Inc. v. T-Mobile USA, Inc., 522 F.3d 1299, 1305 (Fed. Cir. 2008) (internal quotation marks omitted) (quoting Ralston Purina Co. v. Far-Mar-Co, Inc., 772 F.2d 1570, 1573 (Fed. Cir. 1985)). Thus, SIMO did not bear the burden of proving the priority date of the '689 Patent, but only of coming forward with evidence of an earlier priority date.

27

uCloudlink argues that the testimony of plaintiff's damages expert, Mr. Martinez, should have been excluded. Def. Mem. Supp. Mot. New Trial 9-12. The complaints it levies against Martinez's methodology here are the same as those presented in uCloudlink's motion for judgment as a matter of law on damages, and the Court rejects them for the reasons already given. See supra § II(A)(2).

### 5. The Exclusion of Mr. Hansen's Testimony

uCloudlink also objects to the exclusion of the opinion of its damages expert, John Hansen, regarding a reasonable royalty. Def. Mem. Supp. Mot. New Trial 12. The Court granted SIMO's motion in limine to exclude Hansen's opinion on this subject because his analysis "capped" the reasonable royalty rate based on uCloudlink's profit margin for the Infringing Devices. "[A]n infringer's net profit margin is not the ceiling by which a reasonable royalty is capped." Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1346 (Fed. Cir. 2013). uCloudlink argues that Hansen did not cap his analysis based on net profits, but Hansen's own report shows that he did. Indeed, in the very first sentence of the paragraph quoted by uCloudlink in the instant memorandum, Hansen announced that he was "[a]pportioning the profits attributable to the '689 patent." Def. Mem. Supp. Mot. New Trial 13 (quoting Hansen Rep. ¶ 90, ECF No. 150-1). That is clearly a cap; Hansen started with the profits, and then apportioned that number down based on a variety of factors. But longstanding Federal

28

Circuit precedent holds this to be impermissible. E.g., State Industries, Inc. v. Mor-Flo Industries, Inc., 883 F.2d 1573, 1580 (Fed. Cir. 1989).

uCloudlink curiously argues that "[i]t does not make sense to say that Mr. Hansen used uCloudlink's profits as a 'cap' on the royalty rate when his royalty range . . . was below uCloudlink's profits in the first instance." Def. Mem. Supp. Mot. New Trial 13. But of course it makes perfect sense that if Hansen started from uCloudlink's net profits, and then apportioned further, he would arrive at a royalty rate even lower than uCloudlink's profit margin. And the fact that Hansen considered a great number of factors to apportion the profit margin down does not salvage his analysis; the problem was his starting point, and it infected every conclusion he reached.

The Court accordingly detects no error in the exclusion of Hansen's opinion as to a reasonable royalty, nor in any of the other purported errors identified by uCloudlink, either individually or cumulatively. uCloudlink's motion for a new trial is therefore denied.

II. Plaintiff's Motions

A. Motion for Permanent Injunction

SIMO asks the Court to enjoin "importing, selling, offering to sell and enabling the use of" the Infringing Devices. Pl. Mem. Supp. Mot. Inj. at 6 of 26. "To be entitled to a permanent

injunction, a patentee must show: (1) it has suffered an irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." Douglas Dynamics, LLC v. Buyers Products Co., 717 F.3d 1336, 1344 (Fed. Cir. 2013). The Court concludes that SIMO has demonstrated entitlement to a permanent injunction.

First, "[i]rreparable injury encompasses different types of losses that are often difficult to quantify, including lost sales and erosion in reputation and brand distinction." Douglas Dynamics, 717 F.3d at 1344. "Where two companies are in competition against one another, the patentee suffers the harm – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions." Id. at 1345; see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly one factor suggesting strongly the potential for irreparable harm without enforcement of the right to exclude.").

Here, the evidence at trial established that uCloudlink competes with Skyroam, SIMO's wholly-owned subsidiary. Both companies sell devices and data packages to enable global roaming.

30

And while uCloudlink may not be Skyroam's only competitor, the evidence at trial tended to establish that they are the only major companies selling both the hardware and data packages necessary for roaming, without being tethered to a specific carrier. Tr. 164. Accordingly, uCloudlink is at least Skyroam's most direct competitor. Moreover, "the absence of a two-supplier market does not weigh against a finding of irreparable harm." Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1151 (Fed. Cir. 2011). Given the similarity of their products (and uCloudlink's substantially cheaper prices), and the fact that they operate in many of the same countries, it seems virtually certain that SIMO would lose some sales to uCloudlink as a result of the infringement. Additionally, both companies offer a "closed" ecosystem, that is, each sells data packages that only function with that company's device. A consumer who has already bought into uCloudlink's ecosystem, therefore, is unlikely to switch to Skyroam's, because they would have to buy another hotspot device. Thus, lost customers are likely to stay lost. That suffices to show irreparable harm.

SIMO has also "show[n] some connection between the patented feature and demand for [uCloudlink's] products." Apple Inc. v. Samsung Elec. Co., 735 F.3d 1352, 1364 (Fed. Cir. 2013). The technology described in the '689 Patent permits a roaming device to access SIM card information to mimic a local device, and thereby access a local communication network. That capability – the ability

31

to roam without swapping physical SIM cards or incurring roaming costs – is at the core of uCloudlink's hotspots. It is the central function that the hotspots perform, and it unquestionably at least "one of several features that cause consumers to make their purchasing decisions." Apple, 735 F.3d at 1364.

The Court further concludes that money damages are not an adequate remedy. While the evidence demonstrates that SIMO has lost at least some sales to uCloudlink, it is very difficult to estimate the number with any certainty. Additionally, uCloudlink's significantly lower pricing – it charged only $3.50 per Daypass, while SIMO charged $9.00 – could set consumers' expectations for pricing lower and cause SIMO to lose goodwill.[14] The long-term effects of that kind of detrimental effect are difficult to calculate.

The balance of hardships is neutral. While it is undoubtedly "a substantial hardship" to "requir[e] [SIMO] to compete against its own patented invention," Robert Bosch LLC, 659 F.3d at 1156, it would also impose a substantial hardship on uCloudlink to enjoin it from selling a significant portion of its product line in the United States. It is true that uCloudlink sells its products in many other countries, so a bar on sales in the United States would

---

[14] The evidence at trial suggested that $10.00 was a common price for carrier-based Daypasses as late as 2017, although in 2018 at least one carrier had lowered its price to $5.00. Tr. 316, 550-51.

likely not devastate its bottom line. But, by the same token, SIMO would have to compete with uCloudlink abroad even if this injunction was granted – so the hardship to SIMO would only be partially alleviated in any event.[15]

Finally, the public interest would not be disserved by an injunction. Although "competition serves the public interest," the public interest is not served by "cheap copies of patented inventions [that] have the effect of inhibiting innovation and incentive." Douglas Dynamics, 717 F.3d at 1346. Moreover, the fact that other competitors service this market, even if not with precisely the same type of product as SIMO or uCloudlink, minimizes the risk that consumers will be held hostage to unreasonable prices as a result of the injunction.

Balancing the above factors, the Court concludes that a permanent injunction is appropriate to protect SIMO from further infringement. uCloudlink argues, however, that it has redesigned its products such that they do not infringe, and so there is no activity to enjoin. Def. Opp. Mot. Inj. 7. The Court is not persuaded. "The fact that the defendant has stopped infringing is generally not a reason for denying an injunction against future infringement unless the evidence is very persuasive that further

---

[15] SIMO argues that the balance of hardships is in its favor because uCloudlink has much higher annual revenue. Pl. Mem. Supp. Mot. Inj. at 21 of 26. But a raw comparison of the parties' revenue says little about which party would be more burdened by the entry, or non-entry, of a permanent injunction.

33

infringement will not take place." W.L. Gore & Assocs., Inc. v. Garlock, Inc., 842 F.2d 1275, 1281-82 (Fed. Cir. 1988), abrogated on other grounds by eBay Inc. v. MercExchange, LLC, 547 U.S. 388 (2006). The Court is not persuaded that the redesign is sufficient to prevent future infringement.

uCloudlink's only evidence in support of its redesign is a declaration by Zhihui Gong, its Chief Technology Officer. See Gong Decl., ECF No. 242. Dr. Gong represents that, beginning in June 2019, uCloudlink began pushing a software update to all Infringing Devices. Id. ¶ 8. The update is automatic if the device is turned on, so long as it has sufficient battery power. Id. ¶¶ 16-17. All newly-manufactured devices include the redesigned software. Id. ¶¶ 15, 21.

The Court has two concerns that prevent it from concluding that this update is sufficient to prevent infringement. First, and less importantly, Dr. Gong's declaration does not clarify how widespread the update rollout has been. He represents that, as of the date of his declaration, 76,586 devices had been upgraded. Id. ¶ 20. But he does not say how many devices in use remain un-upgraded, or offer any estimated timetable by which the upgrade would be complete.

This, however, is a minor complaint. The Court's larger concern is with the purported function of the upgrade, which conflicts significantly with how the Court understands the

34

technology at issue to operate. Dr. Gong represents that the new software permits the devices to operate in one of three "modes," "depending on whether the Cloud SIM is a physical SIM or a software SIM." Id. ¶ 14. This is the Court's first source of confusion, because the Cloud SIM in the Infringing Devices is always a virtual (or software) SIM, dispatched from the uCloudlink's backend servers. See Summary Judgment Opinion 4. This distinguishes it from the "seed SIM," which can be physical or virtual. Dr. Gong does not explain how a "physical Cloud SIM" would work, or how it is assigned to the upgraded devices. The Court does not understand, further, how it is possible for a physical SIM card to be pushed via software update.

Dr. Gong goes on to say that "in Modes A and B, the carrier that provides the data communication link is the same carrier that provides the physical Cloud SIM." Gong Decl. ¶ 14.[16] But Dr. Gong does not explain how this process works. Moreover, it would be a substantial change from how the devices were previously configured. At least originally, the devices set up the data communication link by using a seed SIM, which was not subscribed to any U.S. carrier, to connect to a local network on a roaming basis. Summary Judgment Opinion 3. Does the seed SIM now only connect to the network affiliated with the Cloud SIM? How, again,

---

[16] This is confusing as to Mode B, since Dr. Gong declares the sentence before that "Mode[] B . . . use[s] software Cloud SIM." Gong Decl. ¶ 14.

has uCloudlink provided copies of its devices in the wild with a physical Cloud SIM, where previously they lacked one? Dr. Gong's declaration does not provide the Court with answers.

Dr. Gong says that "[i]n Modes B and C, the redesigned Stipulated Devices generate, for themselves, local authentication information using the software Cloud SIM." Gong Decl. ¶ 14. But he once again does not explain anything about how this process works. In the previous version, the Cloud SIM generated an authentication request and transmitted it to uCloudlink's backend servers, which sent authentication information extracted from the physical SIM card stored in a SIM bank. Summary Judgment Opinion 5. At trial, plaintiff's technical expert, Clark, agreed during cross-examination that so-called "soft SIM" technology permitted authentication to occur locally, on the device, without recourse to the remote servers. Tr. 248. Conceivably, defendants' upgrade could be some version of this technology. But without more detail from Dr. Gong, or other corroboration, the Court is not able to make that inference.

Given these uncertainties, the Court is not willing to take at face value defendants' assertions about how the upgrade functions, or that the upgraded devices no longer infringe the '689 Patent. Accordingly, SIMO's motion for a permanent injunction is granted. Defendants are hereby enjoined, effective as of September 1, 2019, from importing, selling, offering to sell, or

36

enabling the use of the Infringing Devices within the United States.

B.    Motion to Supplement Damages

The damages verdict rendered by the jury was based on sales of Daypasses in the United States from August 13, 2018 through December 31, 2018. SIMO now moves to amend the final judgment to include two additional categories of sales: (1) sales of Daypasses in the United States between January 1, 2019 and the present; and (2) sales of Daypasses internationally used by devices sold in the United States. Pl. Mem. Supp. Mot. Amend Judgment 1, ECF No. 234. SIMO additionally seeks pre- and post-judgment interest.

1.    Supplementation to Include More U.S. Sales

The first ground on which SIMO seeks to supplement the judgment is to include U.S. sales data from January 1, 2019 onward. uCloudlink concedes that supplementation is appropriate for post-verdict sales; it argues, however, that SIMO forfeited its right to recover for pre-verdict sales by failing to present evidence of such sales to the jury. Def. Mem. Opp. Mot. Amend Judgment 4, ECF No. 247. Although the Court agrees that SIMO has partially invited this situation through its own inaction, the Court nonetheless finds it appropriate to award damages for this pre-verdict period.

35 U.S.C. § 284 provides that "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the

37

invention by the infringer," and that "[w]hen the damages are not found by a jury, the court shall assess them." The Federal Circuit has emphasized the mandatory nature of this directive and vacated damages awards that do not take into account all infringing activity. E.g., Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1213 (Fed. Cir. 2010).

Defendants contend that Finjan applies only to post-verdict damages. It is true that, in Finjan itself, the Federal Circuit was confronted only with post-verdict damages. But its reasoning – that the damages award must "fully compensate[]" the patentee, id. at 1213 – applies equally to pre- and post-verdict damages. SIMO would not be fully compensated for the infringement if the Court refused to award damages incurred between January 1, 2019 and May 9, 2019, the date of the verdict.

uCloudlink suggests that determining post-January 1, 2019 damages would invade the province of the jury. Def. Mem. Opp. Mot. Amended Judgment 4. The Court cannot see how this is so, since § 284 explicitly directs trial courts to find damages when not found by a jury. Nor does uCloudlink explain how it could possibly be a violation of the jury-trial right for a court to assess pre-verdict damages, but perfectly acceptable for the same court to assess post-verdict damages. Surely if one is permitted, so is the other. Moreover, there is no substantial invasion of the jury's fact-finding function in this case, because the actual sales figures

are undisputed (and provided by uCloudlink itself). The only dispute was as to the reasonable royalty rate, which the jury duly calculated. It does not invade the jury's function to perform the simple multiplication of applying that royalty rate to a subset of sales data that was not before the jury.

The primary case cited by defendants, Oscar Mayer Foods Corp. v. Conagra, Inc., 869 F. Supp. 656 (W.D. Wis. 1994), is distinguishable, because there, the damages were based upon lost sales, which are more difficult to calculate, and in any event it was "not clear whether the jury awarded damages for the period of time up to and including the date of trial." Id. at 668. Here, in contrast, uCloudlink's sales figures are not disputed and it is abundantly clear that the jury's verdict was based only on the sales from August to December of 2018.

Indeed, uCloudlink previously argued that a post-verdict accounting was precisely the right way to handle sales not included in the evidence at trial. Prior to trial, SIMO sought permission to amend its expert damages report, which had previously only included sales data between August 20 and September 30, 2018, to include data between August 13 and December 31. See Pl. Letter Br., ECF No. 159. In opposing that request, defendants wrote the following:

> If the requested supplementation is truly a "simple multiplication" applying "the same analysis and royalty rate" as SIMO claims, there is no reason why the total

39

> damages amount cannot be calculated after trial in an
> amended judgment. This is common practice. A so-called
> simple multiplication "true up" happens in almost every
> patent infringement case. . . . SIMO repeatedly
> emphasized that Mr. Martinez's ultimate royalty rate
> will not change by the supplementation. If this is indeed
> true, then it makes more sense to provide updated damages
> calculation for inclusion in a judgment after the trial
> when additional up to date sales data will be available.

Def. Letter Br. 2, 4, ECF No. 160. It is more than a little strange

for uCloudlink to now argue that pre-verdict damages cannot

possibly be assessed by the Court, when it previously urged this

Court to deny leave to amend an expert report because the Court

could always run the math later.

The Court does not rest merely on this inconsistency but even

more on its conviction that the damages award will not be complete

if it does not include the undisputed pre-verdict U.S. sales data.

Accordingly, the judgment will be amended to include damages for

those sales, at the reasonable royalty rate awarded by the jury.

The Court would be remiss, however, if it did not clearly

state that SIMO's conduct was unacceptably dilatory. SIMO blames

its failure to present evidence as to damages during this period

on uCloudlink's failure to provide 2019 U.S. sales figures. Yet

SIMO never applied to the Court for assistance in compelling

production of any such figures. The Court would have been more

than willing to order defendants to promptly produce such

information, had SIMO only asked. Moreover, even without direct

sales data, SIMO could have asked its damages expert to extrapolate

estimated sales figures for 2019 based on the 2018 sales data.
SIMO made no effort to do so.

If SIMO were the only bad actor here, the Court might well be
tempted to let it live with the consequences of its poor litigation
choices. Yet uCloudlink is not blameless, either. The trial in
this case did not begin until May of 2019, yet uCloudlink did not
produce any 2019 sales figures until after the verdict was
rendered. That, too, was unacceptably obstructionist. True, SIMO
should have sought the Court's aid to obtain the evidence it needed
- but it would never have been put in the position of needing to
in the first place but for uCloudlink's foot-dragging.

Under the circumstances, the doubtful conduct exhibited by
both sides more or less cancels out. In this regard, the Court
finds instructive the case of Metso Minerals, Inc. v. Powerscreen
Intern. Dist. Ltd., 833 F. Supp. 2d 333 (E.D.N.Y. 2011), rev'd on
other grounds, 526 F. App'x 988 (Fed. Cir. 2013). There, the
plaintiff moved for a post-verdict accounting of supplemental
damages for the period between the close of discovery in 2007 and
the entry of the permanent injunction in 2011. Id. at 345-46.
Defendants argued that the plaintiff had waived this issue by
failing to present evidence of damages to the jury, and the court
initially agreed. Id. at 348. The court noted that, as here, the
plaintiff "fail[ed] in a number of respects to do everything in
its power to present comprehensive evidence of damages at the

41

trial," and, in particular, that the plaintiff "could have" – but did not – "appealed to this Court for an order compelling discovery." Id. at 349. However, the court also found the defendants' behavior to be "questionable," and noted that "[n]either party acted reasonably." Id. The court ultimately did not find waiver, reasoning that defendants were not entitled "to the windfall that would ensue if this Court were to exclude damages for this lengthy period of time." Id. This reasoning is persuasive and fully applicable to the instant case.[17]

Accordingly, while SIMO's lack of diligence is troubling, it does not justify excluding the pre-verdict U.S. sales data from the ultimate award.

## 2. Supplementation to Include International Sales

SIMO also contends that the damages award should be supplemented to include sales of Daypasses sold internationally for use with devices purchased in the United States. Pl. Mem. Supp. Mot. Amend Judgment 9. During a January 2, 2019 phone conference, the Court orally denied SIMO's application to compel discovery on

---

[17] Importantly, this is not a case where the patentee appears to have sandbagged its adversary with respect to the issue of damages or attempted to present a barebones case to the jury in the hopes of fleshing out damages after the verdict. Indeed, prior to trial, it was uCloudlink, not SIMO, that tried to prevent the jury from hearing about additional sales data. See Def. Letter Br. There is no indication that SIMO's failure to present a more complete case was the result of bad faith or intentional misconduct, as opposed to simple negligence. The Court therefore need not consider whether refusing to amend the judgment might be an appropriate sanction in a case where such bad faith was present.

42

this issue, without prejudice to renewal at a later date. Prior to trial, the Court granted uCloudlink's motion in limine to preclude plaintiff's damages expert from offering an opinion as to global damages. Upon further consideration, however, the Court concludes that SIMO is entitled to recover damages for the sales of Daypasses linked to U.S.-purchased devices.

uCloudlink argues that SIMO cannot recover for Daypasses purchased abroad because foreign infringement is not infringement at all. Def. Mem. Opp. Mot. Amend Judgment 8; see Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc., 711 F.3d 1348, 1371-72 (Fed. Cir. 2013). But that argument "conflates legal injury with the damages arising from that injury." WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2138 (2018). SIMO does not seek to recover for "infringement" abroad. Rather, it seeks to recover fully for a domestic act of infringement, i.e. the sale of an Infringing Device in the United States. And SIMO is entitled to full compensation for that act of infringement, even if some of the harm traceable to it occurred abroad.

WesternGeco controls this case. There, the plaintiff developed an ocean floor surveying system. Id. at 2135. The defendant created a competing system, components of which were manufactured in the United States. Id. The plaintiff sued for infringement and proved at trial that "it had lost 10 specific

43

survey contracts due to [defendant's] infringement." Id. The Federal Circuit held on appeal that the plaintiff could not recover for lost foreign profits, but the Supreme Court reversed. It reasoned that permitting recovery for lost foreign profits was not an impermissible "extraterritorial" application of the statute, because the focus of § 284 is the infringement, which occurred domestically. Id. at 2137-38.

The same is true here. uCloudlink committed an act of infringement by selling its devices in the United States. In the hypothetical world in which the parties had reached an ex ante licensing agreement, SIMO would be entitled to a licensing fee based on the number of Daypasses sold for use with that device, whether the Daypasses were used domestically or abroad.

uCloudlink's attempts to distinguish WesternGeco are not persuasive. First, contrary to uCloudlink's characterization, the Supreme Court did not hold that "in this specific situation, the presumption against extraterritoriality had been rebutted." Def. Mem. Opp. Mot. Amend Judgment 8. Rather, the Court held that § 284 had not been applied extraterritorially at all. WesternGeco, 138 S. Ct. at 2136.

Second, uCloudlink argues that foreign damages are only available when, as in WesternGeco, the theory of infringement is exporting components abroad. Def. Mem. Opp. Mot. Amend Judgment 8. But that is not right. WesternGeco did not hold that a patentee

44

could recover based on acts of infringement committed abroad; it held that you could recover for harms abroad that are proximately caused by domestic acts of infringement. uCloudlink's argument is strange, because it would hold that the presumption against extraterritoriality applies to inarguably domestic forms of infringement – sales in the United States – but not to forms of infringement that are more tenuously connected to this country, such as exportation. The Court cannot accept that this is the result intended by WesternGeco.

The Court understands WesternGeco to mean that patentees may recover for foreign injuries caused by domestic acts of infringement – as long as, of course, those injuries are proximately caused by the domestic acts. 138 S. Ct. at 2139 n.3. Here, there is no proximate cause concern. The devices at issue are hotspots for international roaming. They are explicitly marketed and promoted as permitting easy access to data while traveling internationally. It was plainly foreseeable that owners of such devices, purchased in the U.S., would buy Daypasses while traveling to other countries.

Accordingly, SIMO's motion to amend the judgment is granted to the extent of ordering an accounting of (1) U.S. sales of devices and Daypasses from January 1, 2019 through August 31, 2019; and (2) sales of Daypasses abroad for use with devices purchased in the U.S.

45

### 3. Pre- and Post-Judgment Interest

In a patent infringement case, "prejudgment interest should be awarded under [35 U.S.C.] § 284 absent some justification for withholding such an award." General Motors Corp. v. Devex Corp., 461 U.S. 648, 657 (1983). Both parties agree that pre-judgment interest is appropriate, but dispute the rate. SIMO seeks the New York statutory rate of 9%. Pl. Mem. Supp. Mot. Amend Judgment 15 (citing N.Y. C.P.L.R. § 5004). Defendants ask the Court to "use the 1-year T-Bill rate, or (at most) the prime rate." Def. Mem. Opp. Mot. Amend Judgment 18.

The Court concludes that the prime rate is appropriate here. "A trial court is afforded wide latitude in the selection of interest rates and may award interest at or above the prime rate." Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991) (citation omitted). "[T]he purpose of pre-judgment interest is solely to compensate the patentee for the lost use of the royalty income he should have been paid." Hoechst Celanese Corp. v. BP Chemicals Ltd., 846 F. Supp. 542, 551 (S.D. Tex. 1994). An award above the prime rate may be justified by, among other things, evidence that the patentee borrowed money at or above the prime rate to finance its operations, see Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1066 (Fed. Cir. 1983), although such a showing is not always necessary, see Uniroyal, 939 F.2d at 1545.

46

Here, SIMO has offered evidence of two loans taken out by Skyroam, on February 21, 2017 and August 3, 2018, with interest rates above the prime rate. See Plam Decl. ¶¶ 4-7 and Exhs. 1 and 2, ECF No. 231. However, there is no evidence that "there was a causal connection between any borrowing" and uCloudlink's infringement. Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997). Moreover, both loans predate August 13, 2018, the earliest date that damages could accrue for infringement in this case, and so the Court is reluctant to use those loans to justify an above-prime rate.

At the same time, it seems clear that the Treasury-bill rate would not adequately compensate SIMO for the infringement. The Court therefore "set[s] prejudgment interest at the prime rate of interest calculated and compounded quarterly, which better approximates a corporate borrower's cost of funds." U.S. Philips Corp. v. Iwasaki Elec. Co., Ltd., 607 F. Supp. 2d 470, 483 (S.D.N.Y. 2009). This pre-judgment interest shall apply only to the compensatory portion of the amended judgment, and not to the 30% punitive enhancement. See Lam, 718 F.2d at 1067 ("[P]rejudgment interest cannot be assessed on the increased or punitive portion of the damage award."). The pre-judgment interest also shall not apply to the supplemental damages awarded herein, but only to the jury's original verdict.

Finally, both parties agree that SIMO is entitled to post-judgment interest as prescribed by statute, i.e. interest at the rate of the weekly average one-year constant maturity Treasury yield, compounded annually. 28 U.S.C. § 1961(a), (b).

## C. Motion for Attorney's Fees

SIMO moves for attorney's fees incurred after either November 9, 2018 (when the Court issued its claim construction order) or April 12, 2019 (when the Court granted summary judgment to SIMO on certain claims of infringement). Pl. Mem. Supp. Mot. Fees 6, ECF No. 215. "The court in exceptional cases may·award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." Octane Fitness, LLC v. ICON Health & Fitness, Inc., 572 U.S. 545, 554 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." Id.

The Court has already, in effect, expressed·its opinion that this was not an exceptional case. See Enhanced Damages Order 4 ("[T]he great majority of [uCloudlink's] arguments were not frivolous, and indeed many had some merit. . . [F]or most of this case it had a colorable defense. Similarly, the Court disagrees

48

with plaintiff's argument that this case was not close.") (citation omitted). The Court's view of the case has not changed since issuing that Order. Even after entering partial summary judgment in favor of SIMO, uCloudlink retained colorable anticipation arguments, as well as reasonable criticisms of Martinez's damages calculation. That those arguments were unsuccessful does not mean that they were unusually weak or that it was objectively unreasonable to take the case to trial. Nor does the jury's finding of willful infringement make this an "exceptional" case. See Stryker Corp. v. Zimmer, Inc., 837 F.3d 1268, 1279 (Fed. Cir. 2016). Accordingly, the Court declines to award attorney's fees.

### D. Motion for Costs

Finally, SIMO has submitted a proposed bill of costs, ECF No. 211, to which uCloudlink has lodged objections, ECF No. 225. The Court agrees with certain of uCloudlink's objections, as detailed below. Any objections not addressed have been considered and rejected.

First, SIMO seeks to recover $2,623.67 to cover printing a set of its trial exhibits for opposing counsel. Bill of Costs ¶ 5, ECF No. 212. Local Civil Rule 54.1(c)(5) provides that copies of exhibits are taxable if "the copy was used or received in evidence," but that "[t]he cost of copies used for the convenience of counsel or the Court are not taxable."

49

Second, SIMO seeks to recover $9,522.66 in witness fees. Bill of Costs ¶ 7. Witness fees, travel expenses, and subsistence "authorized by 28 U.S.C. § 1821" are taxable. Local Civil Rule 54.1(c)(3). However, subsistence payments cannot "exceed the maximum per diem allowance" prescribed for official government employee travel. 28 U.S.C. § 1821(d)(2). The per diem allowance in New York City in April and May of 2019 was $253.00 per night for lodging, $76.00 per full day of meals and incidentals, and $57.00 per day of travel for meals and incidentals. SIMO's submission egregiously exceeds these limits.[18] The maximum amount recoverable is $1,721.00 for Mr. Martinez and $3,657.00 for Dr. Clark.

Third, witnesses may recover for travel expenses only if they "utilize a common carrier at the most economical rate reasonably available." 28 U.S.C. § 1821(c)(1). Mr. Martinez spent over $1,200.00 on his plane tickets between Austin, Texas and New York City, a rate that, based on the Court's research, appears to substantially exceed the typical price for business class tickets on this route, even those purchased on short notice. The Court acknowledges that the scheduling of this trial was somewhat in flux, but at least as early as April 18 the trial was firmly set

---

[18] Most egregiously, Dr. Clark appears to have spent $210.00 on drinks at the "Ketch Brewhouse Bar" on May 6, 2019, and $1,050.00 the following night at the "Ketch Brewhouse Manual F&B." How Dr. Clark spends his money is, of course, no business of the Court's. But it is disconcerting that SIMO would attempt to recoup what appears to be the costs of a post-verdict celebration.

to begin May 1.[19] The Court believes a more economical air fare was likely available, and so will reduce these costs by 50%, to $614.64.

Accordingly, SIMO's bill of costs must be reduced by $12,040.49, for a total of $46,272.40.

III. Conclusion

For the foregoing reasons, the Court disposes of the pending motions as follows:

Defendants' motions for judgment as a matter of law and for a new trial are denied.

Plaintiff's motion for attorney's fees is denied.

Plaintiff's motion for a permanent injunction is granted. Defendants are hereby enjoined, beginning September 1, 2019, from selling, offering to sell, importing, or enabling the use of the Infringing Devices in the United States.

Plaintiff's motion for costs is granted in the amount of $46,272.40.

Plaintiff's motion to amend the judgment is granted. By no later than September 15, 2019, defendants shall serve on plaintiff (1) sales data for Daypasses and devices sold in the United States between January 1, 2019 and August 1, 2019, to the extent such

---

[19] Additionally, since Mr. Martinez did not testify until May 6, the Court questions why it was necessary for him to arrive in New York on April 29. Defendants do not challenge the recovery of costs for his lodging in the intervening period, however, so the Court will allow it.

51

data has not already been produced; and (2) sales data for Daypasses sold abroad for use with devices sold in the United States, between August 13, 2018 and August 31, 2019.[20]

Plaintiff's motion for pre- and post-judgment interest is granted. Pre-judgment interest shall be awarded on the jury's compensatory award, through the date of the jury's verdict, at the prime rate compounded quarterly. Post-judgment interest shall be awarded at the rate of the weekly average one-year constant maturity Treasury yield, compounded annually.

By no later than September 30, 2019, the parties shall submit a joint proposed Amended Judgment consistent with this Opinion and Order. The proposed Amended Judgment shall include (1) the jury's original award; (2) the supplemental damages from the accounting ordered herein; (3) the calculation of pre- and post-judgment interest; (4) the 30% enhancement ordered by the Court to the jury's original verdict; and (5) the costs awarded above.

The Clerk of the Court is directed to close docket entries 213, 216, 219, 222, and 230.

SO ORDERED.

Dated:    New York, NY

          August 28, 2019                  JED S. RAKOFF, U.S.D.J.

---

[20] Defendants have previously represented, although they do not do so now, that they are unable to track Daypasses sold internationally. If that is so, the parties shall inform the Court, by joint telephone call, by no later than August 30, 2019, to discuss next steps for estimating international damages in the absence of direct data.